THE PROVIDENCE BANK, PLAINTIFFS IN ERROR *vs.* ALPHEUS BIL-
LINGS AND THOMAS G. PITTMAN.

In 1791 the legislature of Rhode Island granted a charter of incorporation to
certain individuals who had associated for the purpose of banking. They
were incorporated by the name of the president, directors, and company
of the Providence Bank, with the ordinary powers of such associations. In
1822 the legislature passed an act imposing a tax on every bank in the state,
except the bank of the United States. The Providence Bank refused the
payment of the tax, alleging that the act which imposed it was repugnant to
the constitution of the United States; as it impaired the obligation of the con-
tract created by the charter of incorporation. Held, that the act of the legisla-
ture of Rhode Island, imposing a tax, which, under the law, was assessed on
the Providence Bank, does not impair the obligation of the contract created by
the charter granted to the bank.

It has been settled, that a contract entered into between a state and an indivi-
dual, is as fully protected by the prohibitions contained in the tenth section,
first article of the constitution, as a contract between two individuals; and it is
not denied that a charter incorporating a bank is a contract.

The power of taxing moneyed corporations has been frequently exercised; and
has never before, so far as is known, been resisted. Its novelty, however,
furnishes no conclusive argument against it.

That the taxing power is of vital importance; that it is essential to the existence
of government; are truths which it cannot be necessary to reaffirm. They are
acknowledged and asserted by all. It would seem that the relinquishment of
such a power is never to be assumed. We will not say that a state may not re-
linquish it; that a consideration sufficiently valuable to induce a partial release
of it may not exist: but as the whole community is interested in retaining it
undiminished, that community has a right to insist that its abandonment ought
not to be presumed in a case in which the deliberate purpose of the state to
abandon it does not appear.

The great object of an incorporation is to bestow the character and properties of
individuality on a collected and changing body of men. Any privileges which
may exempt it from the burthens common to individuals, do not flow neces-
sarily from the charter, but must be expressed in it, or they do not exist.

The power of legislation, and consequently of taxation, operates on all the per-
sons and property belonging to the body politic. This is an original principle,
which has its foundation in society itself. It is granted by all, for the benefit
of all. It resides in government as a part of itself; and need not be reserved
where property of any description, or the right to use it in any manner, is
granted to individuals or corporate bodies.

However absolute the right of an individual may be, it is still in the nature of
that right that it must bear a portion of the public burthens, and that portion
must be determined by the legislature. This vital power may be abused; but
the constitution of the United States was not intended to furnish the correc-

tion of every abuse of power which may be committed to the state govern-
ments. The intrinsic wisdom and justice of the representative body, and its
relations with its constituents, furnish the only security where there is no ex-
press contract, against unjust and excessive taxation, as well as against unwise
legislation generally.

THIS was a writ of error to the supreme judicial court of
the state of Rhode Island; and the question which was pre-
sented for the consideration of the court, was the constitu-
tionality of an act passed by the legislature of the state of
Rhode Island, in January 1822, entitled "an act imposing a
duty upon licensed persons and others, and bodies corporate
within this state;" alleged to be a violation of the contract
contained in the charter of the bank. Under the provisions of
this act, and in conformity with them, a tax was imposed on
the Providence Bank; and the bank having refused payment
thereof, a seizure was made for the amount of the tax in the
banking house, by Alpheus Billings, the sheriff of the county
of Providence, and by Mr Pittman, the general treasurer of
the state of Rhode Island. The bank instituted an action
of trespass for this taking against the sheriff and the treasurer,
in the court of common pleas of the county of Providence;
to which action the defendants pleaded in their defence the
act imposing the tax, and the amendments thereto; and that
in pursuance of the provisions of the same a warrant was
issued, and the proceedings which were the subject of the
action were done.

To this plea the bank filed a general and a special de-
murrer. Among the causes of demurrer, the repugnancy of
the acts of the general assembly imposing the tax to the con-
stitution of the United States, inasmuch as they violate the
contract set forth in the declaration, the act incorporating
the bank, and, inasmuch as they authorise private property
to be taken for public purpose, without providing any com-
pensation; are distinctly stated.

A judgment against them was submitted to by the bank
in the court of common pleas; and they appealed to the
supreme judicial court, where the judgment of the inferior
court was confirmed by submission on the part of the bank;

and they prosecuted this writ of error, under the twenty-fifth section of the judiciary act of 1789.

The Providence Bank was chartered by the legislature of Rhode Island in October 1791. The preamble of the act states,

" Whereas, the president and directors of a bank established at Providence, on the 3d of October last, have petitioned this general assembly for an act to incorporate the stockholders in said bank, and whereas, well regulated banks have proved very beneficial in several of the United States, as well as in Europe: therefore be it enacted by the general assembly, and by the authority thereof it is hereby enacted; that the stockholders in said bank, their successors and assigns, shall be, and are hereby created, and made a corporation and body politic, by the name and style of the president, directors and company of the Providence Bank, and by that name shall be, and are hereby made able and capable in law, to have, purchase, receive, possess, enjoy, and retain to them and their successors, rents, tenements, hereditaments, goods, chattels and effects of what kind or nature soever, and the same to sell, grant, devise, alien or dispose of, to sue and be sued, plead and be impleaded, answer and be answered, defend and be defended, in courts of record, or any other place whatsoever; and also to make, have and use a common seal, and the same to break, alter and renew at their pleasure, and also to ordain, establish and put in execution such by-laws, ordinances and regulations, as shall seem necessary and convenient for the government of the said corporation, not being contrary to law, or the constitution of said bank, and generally to do and execute all and singular acts, matters and things, which to them it shall or may appertain to do.

" And whereas, the stockholders, on the said 3d day of October, formed and adopted a constitution for said bank, in the words following, viz.

" Taught by the experience of Europe and America, that well regulated banks are highly useful to society, by promoting punctuality in the performance of contracts, increasing the medium of trade, facilitating the payment of taxes,

preventing the exportation of specie, furnishing for it a safe deposit, and by discounts rendering easy and expeditious the anticipations of funds on lawful interest, advancing at the same time the interest of the proprietors; we, the subscribers, desirous of promoting such an institution, do hereby engage to take the number of shares set against our names respectively, in a bank to be established in Providence, in the state of Rhode Island, on the following plan, &c.

The plan of the association is set forth in the act, and is made a part of the charter. It provides for the opening of subscriptions for the stock of the bank, to consist of six hundred and twenty-five shares, of four hundred dollars each, making a capital of two hundred and fifty thousand dollars; and for the organization of the bank. The act gives to the corporation the usual powers necessary to carry into effect the objects of its formation, and makes provisions for the transaction of the business of the company. Amendments to this act were afterwards passed by the legislature.

The case was argued by Mr Whipple, for the plaintiffs in error; and by Mr Hazzard and Mr Jones, for the defendants.

Mr Whipple, for the plaintiff in error, said; as this case involves constitutional principles of great delicacy and importance, it may not be useless to advert to the principles establish d by this court.

At no period in the political or civil history of England or of this country, has it been admitted that the legislature possessed unlimited or absolute power. Under the British government, the rights of private property were respected, long antecedent to emigration to this country; although violence to the political rights of the subjects of the crown are frequently recorded in history. The immunities of private property, and the inviolability of vested rights, have been asserted by political and legal writers, and established by judicial decisions, for three centuries past.

The assertion of a limit to legislative authority was constant during the colonial existence of this country; and the principle was afterwards inserted in the bills of rights, and in the constitutions of states. At a very early period af-

ter the establishment of the government of the United States, it became necessary to give to these received opinions the sanction of judicial authority; and this was done by this court in 1798, in the case of Calden *vs.* Ball, 3 Dall. Rep. 186. 1 Condensed Rep. 172. The principles of that case, so far as they declare the obligation of a contract to be superior to the power of the legislature, were re-asserted in Fletcher *vs.* Peck, 6 Cranch's Rep. 88. Again these principles were maintained in the cases of the State of New Jersey *vs.* Wilson, 7 Cranch, 104. Terrett *vs.* Taylor, 9 Cranch, 43. The Town of Pawlet *vs.* Clarke et al. 9 Cranch, 202. Sturges *vs.* Crowninshield, 4 Wheat. 122. M'Culloch *vs.* Maryland, 4 Wheat. 316. The Dartmouth College *vs.* Woodward, 4 Wheat. 518. Weston *vs.* The City Council of Charleston, 2 Peters, 450.

The cases which have the strongest bearing, and which are thought to decide the present case, are Fletcher *vs.* Peck, M'Culloch's case, the Dartmouth College case, and the case of the City Council of Charleston. Fletcher *vs.* Peck establishes the principle that a state cannot invalidate its own grant; that in making a grant, it acts as a party, and is bound as a party. "Every grant (say the court) is, in its own nature, an extinguishment of the right of the grantor; and implies an obligation not to re-assert that right."

The Dartmouth College case puts an end to all discussion of the question, whether a charter is a contract, and whether the public benefit derived from them is not a sufficient consideration? The language of the court is so full and clear upon those points, that it is believed that no doubt will be entertained upon them.

Mr Whipple then went into a particular examination of the case. He said the bank was incorporated in 1791, with the usual powers of a corporation. The motives of the legislature in granting the charter, which was the legal *considera-tion* of the grant, are declared in these terms.

"Taught by the experience of Europe and America, that well regulated banks are highly useful to society, by promoting punctuality in the performance of contracts, increasing the medium of trade, facilitating the payment of taxes,

[Providence Bank *vs.* Billings and Pittman.]

preventing the exportation of specie, furnishing for it a safe deposit, and by discounts rendering easy and expeditious the anticipations of funds on lawful interest, advancing at the same time the interest of the proprietors," &c.

The first and seventh sections of the charter evidently contemplate the ownership of property by the bank in its corporate capacity. The real estate and the profits of the capital stock, previous to a dividend, may be considered as belonging to the bank. But the capital stock itself is as much the property of a stranger as of the bank. There cannot well be two entire owners to the same property. The stockholders have the property, and the corporation the management of it. The corporation is not even the trustee: for it has not the legal estate, and no power to sell. It has merely the naked possession, with the perpetual legal right of using the funds for the benefit of the legal and equitable owners.

The stock was subscribed for at a very early period, and the bank went into successful operation. The capital was subsequently increased to five hundred thousand dollars. For many years past, the shares have sold from fifteen to twenty-five per cent. advance, owing, in part, to the belief that the charter was perpetual, and that the legislature had no power over it. No power to repeal or to modify, by subsequent law, was reserved; and none was believed to exist, until January. 1822.

Most of the present owners purchased their stock at an advance, a part of which will be lost to them, if the power recently claimed by the legislature has a legal and a constitutional existence. The charter of the Providence bank was the first that was granted by the legislature of Rhode Island. For several years it was the only bank in the state. Between the date of its charter, however, and June 1822, several charters were granted, substantially like it. In June 1822, the time when the act imposing a tax on banks went into operation, the charter of the Mount Hope bank, in Warren, was granted.

The eighth section provides, " that this act of incorporation be, and the same is hereby declared to be, subject to all

acts which may be passed by the general assembly, in amendment or repeal thereof, or in any way affecting the same."

The power of the legislature to tax the banks had been previously denied; and the argument against that power was delivered but a few days before the granting the charter of the Mount Hope bank. All the charters since contain a similar reservation.

From the earliest period, down to the act of 1822, taxes in Rhode Island had been uniform. The proportion which each town was bound to contribute was settled by an act passed in 1747. By the act of 1747 the proportion which the town of Providence paid towards the expenses of the state was one-ninth. A new apportionment among the several towns in the state was made in 1796, by which the town of Providence was required to pay one-fifth. In 1824 another apportionment fixed nearly one-third upon that town. Only one tax, however, has ever been ordered under that estimate.

The mode of collecting taxes under these various laws produced great uniformity as to individuals. The treasurer of the state issued his warrant to the treasurers of the several towns, requiring them to collect from the inhabitants each town's proportion of the sum to be raised. The proportion of each town was assessed upon individuals, according to the supposed value of their real and personal estate. This has been the usage from the earliest settlement of the state, with very slight variations, down to the act of 1822. With the exception of one tax of fifteen thousand dollars, ordered by an act of May 1824, the whole expenses of the state have been paid under the act of 1822. The whole amount collected under the license act of 1822, from its commencement to the end of the year 1827, is thirty-five thousand nine hundred and twenty-one dollars twelve cents. Of that amount twenty-six thousand three hundred and eighty dollars eighty-six cents was paid by the town of Providence, and twelve thousand eight hundred and eighteen dollars by the banks. The largest proportion of the bank capital is in hat town, and the effect of the license act has

been to burthen it with more than two-thirds of the taxes of the state. The amount paid under the act, in 1828 and 1829, by the town of Providence, was three-fourths of the whole. The proportion has been increasing against the town from 1822 to the present time, as will be seen by an examination of the accounts of the treasury. The whole real estate, and all other property in the state, is exempted from taxation; and the paying part of the business of government thrown principally upon one town.

The question for the consideration of the court is, whether such a tax, so far as regards the banks, whose charters were granted previous to 1822, and without any reservation of authority over them, is a constitutional tax? It will be kept in mind that the charters of all banks established since May 1822 contain ample reservations of power.

The charter of the Providence Bank was granted in November 1791; and until 1797 it was the only bank in the state. Its capital, at first, was fixed at two hundred and fifty thousand dollars, but it was subsequently increased to five hundred thousand dollars. Although no bonus was paid to the state, yet the advantages expected by the public, are fully stated in the charter, and constitute the consideration of the contract. The contract was, that the stockholders should be entitled to all the advantages of employing their money in banking business, through the agency of a corporation; and the state to all the benefit of a "well regulated bank." These advantages were expected by the parties, for they are expressly stated in the charter, and constitute reciprocal rights and obligations. Whenever the business of the corporation is so managed as to injure instead of benefiting the public; whenever an undue amount of bills is issued; specie payments refused, and the currency depreciated; then is there a violation of the contract on the part of the stockholders, and the sovereign may interfere, for they contracted to maintain a "well regulated bank." The state has a right to see this object accomplished, and to pass all laws necessary for the purpose. The admission which we most freely make, of a power in the state, so to regulate the conduct of corporations as to attain the objects of their for-

mation may appear to conflict with a proposition, which we shall endeavor to sustain; which is this, that the state, by becoming a party to the contract, was as much bound to respect the rights of the other party, as if the state had been an individual. There is, however, in reality, no hostility between the admission and the proposition. All the legislative power which the state has a right to exert, is remedial in its character, furnishing remedies for or against the corporations, and imposing penalties for violations of their contract. The same power might have been exercised over the Dartmouth college, and the same authority is constantly exercised in all the states, over corporations of their own creation. The proceedings of the legislatures of some of the states are of a mixed character, partly legislative and partly judicial. So far as they are legislative, they are clearly remedial; so far as they are judicial, they annex penalties for doing what, under a more regular system of jurisprudence, they would be adjudged to have forfeited their charter for doing.

In the examination of this case, it will be necessary to consider,

1. The contract, the rights which it confers on one party, and the obligations it imposes on the other.

2. The act of 1822, and the effect which that act has upon the rights conferred by the contract.

3. The provision in the constitution of the United States, against impairing the obligation of contracts.

First, what was the contract? This general question involves an inquiry into the elements which usually constitute what the law terms a contract. The usual ingredients are : a consideration, parties, and a subject matter. What is called the obligation of a contract, is the duty which the law imposes upon a party not to disturb any of the legal rights conferred upon the other party. The extent of the rights of one party, therefore, is the measure of the obligation of the other.

In the first place, there was a full and an ample consideration; not a consideration implied, but expressly stated. The risk of advancing two hundred and fifty thousand dollars, in 1791, to be employed in banking business, was very

great. The constitution of the United States was not rati-
fied in Rhode Island, we think, until the year 1790. Al-
though at that period the people of that state had been
" taught, by the experience of Europe and America, that well
regulated banks were highly useful to society," yet they had
not been taught that they were very profitable to the stock-
holders. The times were still very feverish. The shock oc-
casioned by paper money had not entirely subsided. The
effect of the constitution of the general government had not
been ascertained. Money was very scarce, credit very low,
and punctuality out of the question. Indeed, it is stated in
the charter, that one of the effects beneficial to the public,
expected from the bank, was to promote punctuality in pay-
ments. The wonderful activity given to trade a short time
after, by the war in Europe, was then unlooked for. Under
these circumstances, it required all the influence of the
leading men in the town of Providence, to obtain money suf-
ficient for so hazardous and doubtful an enterprise. So un-
certain was the experiment, that a subscription could not
be obtained, without providing in the charter a remedy for
the collection of debts due to the bank, which was withheld
from all individuals. This remedy consisted in the power
of attaching the real and personal estate of the debtor, on
mesne process. In practice, this amounted to a priority of
payment. The state willingly granted this, in consideration
of the value of the institution to the public, and the hazard
to the stockholders. The same remedy has been granted to
all banks since, in order that one may have no advantage
over the other.

Notwithstanding these inducements, a period of six years
elapsed before another bank went into operation. The first
meeting of the stockholders of the bank of Rhode Island
was at Newport, in January 1797. The consideration then
was ample. The stockholders purchased the privilege of
banking. They paid for it a high price, and the case will
result in a question whether they are to pay for it again.

The parties to the contract were the stockholders in their
individual capacity, on one side; and the state in its sover-
eign character, on the other. It was not a contract between

the state and the corporation; the corporation had no existence until the contract was completed. The corporation, instead of being a party, was the subject of the contract. It was the thing granted, and not the person to whom the grant was made. The other party was a state, possessing various and extensive sovereign powers. In making this contract, it acted in its sovereign character; for it had no other character in which it could act. It meant to bind itself in its sovereign character; for there was no other character which it could bind. It was well known that the principal strength of sovereignty consisted in its power of making laws, and that the only effectual mode of binding sovereignty was to restrain its law-making power; and that, to restrain its law-making power upon all subjects but one, and leave it free upon that, was tantamount to no restraint at all. If, therefore, the state was a party to a contract, it intended to bind its law-making power. The law presumes that a party understands the legal effect of a contract, and that he intends that legal effect. The legal effect of a contract is to bind the parties to all its stipulations; to bind them in the capacity in which they contracted, and to bind them equally. It was intended then that both the parties should be bound, and that, consequently, neither should possess the power to liberate itself, without the consent of the other. It therefore results from the fact that the charter is a contract; that the state meant to bind itself in its sovereign capacity, and to restrain the exercise of all its law-making powers, so that it should not be able to resume the grant, or to render the subject of the grant of no value, or to make its value dependent on its own will, instead of being dependent upon the terms of the contract, and the law of the land.

But further: the fact of the state's having become a party to a contract, is not only conclusive evidence that it intended to bind itself, and to restrain all its law-making powers, but it is evidence of the extent to which it meant to impose that restraint. The object of binding the state at all, was to secure the rights of the other party: consequently the degree of restraint must be such as will afford that security.

There is an absurdity in saying that the state meant to bind itself, in order to secure the rights of the other party, and saying, at the same time, it intended a less degree of restraint than was sufficient for the purpose.

If the state intended to be bound at all, it intended to be bound to the same extent as though it had been an individual, and not a sovereign state.   A contract, in its very nature, imports reciprocity of rights and obligations.   One party is not to be bound to a greater extent than the other, unless it is so expressed, or unless it is implied from necessity.

Having briefly considered what was the consideration of the contract and who were the parties, a more important object presents itself, which is to ascertain its obligation. This can be done in no other way than by resorting to its subject matter.

Rights and obligations are correlative terms.   The extent of the rights of one party is the exact measure of the obligation of the other : for, in the language of this court, " every grant implies an obligation not to re-assert the right granted."

1. There was granted to the stockholders, and to their successors, a perpetual right to the powers and capacities of a corporation, denominated " the president, directors and company of the Providence Bank."

2. There was also granted a perpetual right to employ five hundred thousand dollars in banking business.

It would be absurd to say that the stockholders obtained an act of incorporation, for the sake of an act of incorporation ; that they obtained a grant of the right of doing banking business for the sake of banking business ; but both were granted for the profit that might arise from them.   Is it not fairly to be implied, that the amount of that profit should be all that could be made by banking business under the general laws of the land ?   The corporation, and the right to transact banking business, were granted as mere means : the end was the expected profit.

It must be agreed, that the charter was to be perpetual, and that the stockholders cannot be deprived of it.   It must

be agreed that the right to transact banking business was to be perpetual, and that the stockholders cannot be deprived of it. Must it not, then, be agreed, that the right to all the profits was to be perpetual, and that the stockholders cannot be deprived of it? If the right to the means was intended to be legal rights, was not the right to the end to be of the same character? Can it be believed that perpetual means would be granted, to obtain a doubtful and uncertain end? That the subordinate parts of the contract should be held as rights, subject only to the law of the land; but that the main object should be possessed only as a legislative indulgence? The presumption of law is, that all the rights between the same parties, and conferred by the same grant, are to be of the same character, subject to the same tenure, and to continue during the same time. Nothing but strong language to the contrary will create a difference. The act of incorporation is a legal right, subject to no partial or direct legislation. The right to banking business is a legal right, subject to no partial or direct legislation. Why, then, is not a perpetual right to all the profits a legal right, and subject to no partial legislation? Why should the control of the state over one of these rights be greater than over the other?

We will now examine the act of 1822, with a view to ascertain whether it involves the power to destroy the rights granted by the contract.

The very title of the act is significant. It is " an act, imposing a duty on licensed persons and others, and bodies corporate, within the state." It classes the banks with licensed persons. It considers them, not as exercising their legal rights under their contract, but as enjoying privileges by the license and permission of the state.

It enacts that there shall be, hereafter, annually paid by the persons and bodies corporate within this state, herein named, the following sums, to wit:

" By each and every person licensed by the town councils of the several towns, the sum of two dollars, to be paid to the town councils before granting the license, and by them to be paid over to the general treasurer.

" By each and every money broker, or money changer, and each and every vendor of foreign lottery tickets, the sum of one hundred dollars, to be paid to the town councils at the time of granting licenses to those persons.

" By each and every bank within this state, (except the bank of the United States,) the sum of fifty cents on each and every thousand dollars of the capital stock actually paid in."

It is too apparent to be denied that the legislature considered the charter of the banks as mere licenses. Even on that ground, it would have been no more than equal justice to have required the fee when the license was granted, as is provided in relation to all the other licensed persons mentioned in the act. It is a requisition; a duty. It lays no claim to the character of a tax. A tax implies proportion, 5 Rep. 53. It is a specific duty upon the privilege of the bank; upon the franchise granted and paid for. Its advocates do not deny that this is its character: on the contrary, they assert it, and justify it. They are driven to this by necessity, for there is no other character that can attach to it.

No one pretends that it is a tax upon the property of the banks. The act provides " that, hereafter, there shall be annually paid by the persons and bodies corporate, within this state, herein named, to and for the use of the state, the following sums, to wit, by each and every bank one dollar twenty-five cents on each and every thousand dollars of the capital stock actually paid in." The capital stock is referred to, in order to equalize the duty among the banks themselves. The duty is not upon the capital stock, but upon the banks. In relation to each other, it is a duty in proportion to the capital stock. In relation to all other persons, it is a direct and arbitrary requisition, not based upon property, not controlled by any usage, and depending for its amount entirely upon the will and caprice of one of the parties to the contract.

There are but three views that can be taken of this act. It is, first, either a tax upon the persons or polls of the corporations; which subjects it to the objection that it does not at the same time tax the persons of other corporations or indi-

viduals; or, second, it is a tax upon the franchise of the bank, which was purchased by the stockholders; or, third, it is a tax upon the capital stock of the bank, which is a new species of property, and one of the fruits of the contract. The intention was to tax the franchise; to consider the banks as licensed persons; and, in common with other licensed persons, to compel them to pay an annual stipend for the privileges they enjoy. Suppose the Providence Bank had paid fifty thousand dollars for these privileges, at the time of receiving their charter, could it be compelled to pay for them again? How does it alter the case, that the payment was in benefits of another kind, which the state acknowledge to have received? Go farther: suppose this franchise to have been a free gift, can payment be subsequently demanded?

But whether the act of 1822 is a tax upon the privileges of the banks, or upon their property, or a duty or requisition upon them as licensed persons, will not essentially vary the question; inasmuch as it must be conceded, on all hands, that it involves the power to destroy all their beneficial rights. This was one of the points expressly decided in M'Culloch's case. If the state has jurisdiction over the subject matter; if it can select its own contract, or the privileges or property conferred by its own contract, and impose a specific duty upon them, and them alone; it can destroy those privileges, because it must necessarily be the sole judge of the amount. Although at present the expenses of the state are small, yet, in cases of war, internal commotions, or the happening of any other causes which would increase our expenditures, it will probably be thought expedient and just that the banks should contribute the same proportion then as now. If it is deemed legal and honest to load them with one-third of all the burthens of government now; why will it not be legal and just then? Nay, why not one half, or three-quarters, or the whole? If this court decide this tax to be constitutional, must it not decide that a requisition of one half of the income of the capital stock will be constitutional? In whatever point of view, therefore, this act is considered, it involves the power, and, as we shall directly show, the legal power,

the legal right to destroy the contract to which the state is a party.

An examination of the constitution of the United States will show that this is the necessary result. . The clause belonging to this subject is,. " that no state shall pass any law impairing the obligation of contracts."

." No state shall pass any law!" It intended to exclude all laws having that effect. It made no exception in favour of laws imposing taxes; but it intended,.that the taxing power, like all other powers, should be so exercised, as not to impair the obligation of contracts.. What use would there have been in the prohibition, if it had left the state free as to one of its powers? Would not such freedom have destroyed the whole effect of the provision ?

But further : no state shall pass any law " impairing the obligation of contracts." It does not confine itself to the direct and express, but extends to all the implied obligations. It also extends to all contracts ;. those to which a state is a party, as well as the contracts of individuals.

" No state shall pass any law impairing the obligation of contracts!" Does this prohibit the power of impairing contracts, or the exercise of that power? It must be remembered that this, and all the other prohibitions against the states, are addressed not to natural persons, possessing physical powers, but to artificial persons, possessing legal powers. A prohibition not to steal leaves the natural person with the physical power of violating the injunction : but does it not destroy the legal power? The powers of the states are all legal powers. They have no physical or natural powers. A prohibition, therefore, against the exercise of a legal power, is an annihilation of the power itself; and any law so dependent upon the existence of such a power, or so closely connected with it as to render it practically impossible to sustain the law, without submitting to the exercise of the power, must be an unconstitutional law:

Apply this principle to the present case. The state has no power to impair its own contract. It cannot resume the charter : it cannot prohibit banking business : it cannot take all the income of the capital. It will be agreed that no such

power can be exercised.. How then can it exist? How can a legal power exist which it is unlawful to use, or a legal right which cannot be exercised? Physical powers may exist, the action of which is prohibited: but legal powers exist only in action. They are contemplated only with a view to their exercise. A legal power is a right to do certain things. A power to destroy the rights of the banks is, therefore, equivalent to the actual destruction of them; because a power to destroy is a legal right to destroy. Considered in relation to its citizens; all the powers of sovereignty are legal rights.

We say, that if it is admitted that the charter is a contract, the whole controversy is admitted; because every contract necessarily excludes all power in either of the parties to destroy the rights which vest under it. A tax upon the franchise is a tax upon the contract itself. The law implies a right in the states to tax the banks; that is, the property of the banks; but it does not imply a right to destroy. The state of Rhode Island has contracted not to tax the Blackstone canal. The state of New Jersey contracted, in the case of New Jersey *vs.* Wilson, not to tax certain lands. The exemption of that canal and those lands is a privilege or franchise. Would a tax upon that privilege be valid? Would it not violate the spirit of the contract? Would it not be mere evasion? The terms of the contract exempted the lands from taxation; but would not that contract have been rendered of no value, if, instead of taxing the lands, they had taxed the privilege or exemption conferred by that contract?

We contend then that the power in question is necessarily excluded; because it is inconsistent with the main and leading intention of the parties, which was to make a contract, and to bind themselves by it.

How can that be constitutional, which necessarily entails consequences that are prohibited by the constitution? How can a law which, beyond all human control, arms the legislature with the legal right of doing what the constitution prohibits their doing, be constitutional? Nay, worse: which puts them in the actual possession of a power, the very ex-

istence of which is a violation of the contract.   How can the legislature legislate themselves into the possession of a power, not only not granted, but expressly withheld by the people ?

But a law involving the power to destroy, is equivalent to a law which actually does destroy, for another reason.   The constitution intended not only that a law which actually impairs a contract should be void, but it also intended that this court should possess and exercise the power of declaring it void.

The act of 1822, if admitted to be valid, will deprive this court of that power.   If the subject and the mode of taxation are admitted to be constitutional, the amount rests in the discretion of the legislature.   The court must submit to any amount that may be imposed.   Their power to protect the rights of the individual is at an end, the moment this law is declared to be valid.   That power constitutes the remedy of the banks.   This law takes from the banks all right to appeal to this court for relief, and all power in the court to extend that relief.   Can this court surrender that power ?   Are not all its legal powers legal duties ?   Is this court to obey the constitution, and retain the power of declaring void a law which the state may pass, destroying the banks ; or to obey the act of 1822, which deprives them of that power ?   Is it to rest with the legislature of Rhode Island to say whether an individual shall retain a constitutional remedy, and this court a constitutional power ?   Is it for the state, against whom this remedy and this power were provided, to legislate the other party out of them ?   This remedy and this power are the constitutional barriers for the protection of private rights ; and an attack upon the outposts is as undisguised war as upon the constitution itself.

An important question in the case remains yet to be considered.   Does not the contract of 1791 afford a necessary implication of an exemption from all modes of taxation which involve the power to destroy ?   That may be said to be implied, which, from a fair construction of all parts of an instrument, appears to have been the probable intention of

the parties. That is necessarily implied, without which the obvious and main intention of the parties would be defeated.

Implications bear the same relation to the express provisions of a contract, that circumstantial does to positive evidence. Perhaps nothing short of a necessary implication would create a total exemption from the taxing power. A fair and ordinary implication would be sufficient to qualify that power, by confining it to the usual modes.

In the present case, we shall attempt to show that there is a necessary implication that the state should neither exercise nor possess the power of destroying any of the rights conferred by the contract. We do not confine the proposition to one mode of destroying those rights; but we mean to contend that all modes in which sovereign power can exert itself were necessarily excluded. The taxing power is undoubtedly of vital importance, though not more so than many others. It is indispensable to the support of government, and so are nearly all the powers which sovereignty usually exercises.

The power to constitute property, or to give to men the dominion over external objects; the power to transmit that dominion from hand to hand, by deeds, wills, descent, and the various other modes; is surely as necessary a power as any other can be. The one creates property; the taxing power operates upon it after it is created.

The attempt to give to the taxing power an importance belonging to no other sovereign power, is reviving the dispute of the relative importance of the stomach and the lungs to animal life.

Before any aid, however, can be derived from the supposed importance of the taxing power, it must be shown that this mode of exerting it is essential to the state. How can it be of vital importance to government to possess the power to tax the money of one man, without at the same time taxing the money of others? How can the existence of government depend on its power to destroy its contracts? There is nothing, then, growing out of the peculiar importance of the power in question, which will rebut any presumption of an exemption from its exercise.

Is the justice or fairness of this proceeding so very urgent? Is the equity of imposing one-third of all the expenses of the state on the banks of such a nature, as to induce us to believe that the parties probably had it in their minds? Suppose the stockholders of the Providence bank had been informed, in 1791, before they had advanced their money, that, instead of peculiar advantages, they were to be subjected to peculiar burthens: would they have accepted their charter? Suppose they had been informed that, instead of the long established usage of uniform taxes, sovereignty intended to call up one of its dormant powers, and spend its whole force upon their money—and their money alone: would they have parted with the money? Did they mean or expect to pay a new consideration, differing from the one specified in the charter, and which the state acknowledged to have received? No very strong equity, therefore, and no pressing necessity, require the exercise. or the existence. of such a power. But, such a power is necessarily excluded, because it is inconsistent with the main and leading intention of the parties; and, it is inconsistent with the legal effect of a grant.

There is another mode by which it may be shown that the law impairs the contract, and that is, by ascertaining its *legal effect*. While upon this point, it may be expedient to notice an argument on the opposite side, which we have reason to believe has had some effect, even on professional minds. It is this: Admitting that the charter is a contract; that it binds the parties; that it confers legal rights on one party and imposes legal obligations on the other: yet, that those legal rights are like the legal rights of all other persons, subject to the sovereignty of the state, and consequently, subject to taxation; that, in fact, the only difference between legal rights conferred by one individual upon another individual, and by a state upon an individual, is a difference of parties; that they are legal rights, when conveyed by an individual, and can be no more, when conveyed by the state; that if specific taxation is not inconsistent with legal rights conveyed by an individual, it is not inconsistent with legal

rights conveyed by the state; and that, if the contract is not violated in the one case, it is not violated in the other.

This popular argument must be answered, and satisfactorily answered, or the case is against us. One moment's consideration of the legal effect of a grant will show the fallacy of this view of the subject, which supposes that the legal right to an acre of land, or to any other property or privilege, is not only of the same nature, but of the same extent, when conveyed by an individual, as when conveyed by a sovereign; whereas, in all cases of unrestricted grants, the extent of the legal rights of the grantee depends, mainly, if not entirely, on the extent of the legal rights of the grantor. An unrestricted grant passes to the grantee, or extinguishes all the grantor's interest in and power over the subject which are inconsistent with the right intended to be granted. " A grant," say this court, in Fletcher *vs.* Peck, " is, in its very nature, an extinguishment of all the rights of the grantor, and implies an obligation not to re-assert that right."

It is no matter who the granting party is, or what he is; no matter in what capacity he acts; no matter how limited or how extensive is his interest or his power: all his power and all his interest, so far as they do not consist with the rights granted, are either transferred or extinguished by the grant. If he is an individual, individual interest and individual power are transferred or extinguished. If a corporation, corporate interests and corporate powers. And, if a sovereign, sovereign interests and sovereign powers.

The question then arises, whether it can be shown that such a tax is necessary? Can it even be shown to be just? What necessity, or what justice, can require the money of one class of men to bear all the burthens of the state? Other governments exist without such odious measures. Even Rhode Island did not discover the necessity of resorting to them, until 1822. How pressing must that necessity be, which it required two hundred years to discover!

The first case before this court was a direct tax upon the operations of the Bank of the United States within the state of Maryland : and the second, a tax by the City Council of Charleston upon the six and seven per cent stocks of the United States.

The same principle prevailed in both cases. The first was a unanimous, the second a divided opinion; but divided upon the question whether the tax was an income or a specific tax. The leading principle established by M'Culloch's case, and confirmed by the case of the City Council, is this: that the constitution of the United States, having conferred upon the general government certain enumerated and specific powers, conferred all the means necessary to the execution of those powers: that the incorporation of a bank was a necessary and proper instrument of fiscal operations; that the law establishing the bank being a law authorised by the constitution, was supreme; and that the unavoidable consequence of that supremacy was, that no state could pass any law conflicting with it; and, that as the act of the state of Maryland imposing the tax involved the power of destroying the bank, it was inconsistent with the supremacy of the law establishing the bank.

To suppose that the Bank of the United States was declared by the court to be exempted from the action of state legislation, because it was the Bank of the United States, or because it was a means of power in the hands of the general government; would be taking but a narrow view of the principle of M'Culloch's case. That a bank was a necessary and proper instrument of power, constituted but a subordinate part of the splendid argument employed on that memorable occasion. It was necessary to take a step much farther in advance; to occupy much higher ground; to show, that, being a necessary instrument of power, the constitution intended to protect it from state legislation. Unless that ground had been occupied, there would have been an end to the bank. The whole case turned upon the intention of the constitution.

The fact of its being an authorized means in the hands of the general government was used as an argument to show that it was intended to be placed beyond the reach of the states. It was the protection afforded to these means, by the constitution; and not the character or inherent virtue of the means themselves, that called out the power, and firmness of the court. Neither the bank nor the custom house, the

navy or the army, could plead sufficient merit of their own; but it was because they were sheltered behind the constitution, that state legislation could not reach them.

Having established the proposition that the constitution had impliedly prohibited the states from interfering with the machinery of the general government; the court proceeded to show that the act of the state of Maryland involved the power of destroying what the states had no power to destroy. Not that the act, of itself, actually did or would destroy, but that it involved the power of destroying. We, therefore, repeat the assertion, that it was not because the Bank of the United States was an instrument of government, but because it was a prohibited subject, that the court declared the act of Maryland to be an unconstitutional act. The great principle is this: because the constitution will not permit a state to destroy; it will not permit a law involving the power to destroy. In order to show that the case turned entirely on that point, let us suppose that the court had arrived to the conclusion that the bank was an authorised instrument of government; but that it was not the intention of the constitution to prohibit the states from interfering with those instruments: would it not have been necessary to have decided that the Maryland act was constitutional? Of what importance was it that the bank was an authorized means of power, other than this, that it afforded a key to the meaning of the constitution? If the bank was a legitimate and proper instrument of power, then the constitution intended to protect it. If not, then no protection was intended. The question, whether it was a necessary and proper means, was auxiliary to the great question, whether the constitution intended to shelter it; and when the court arrived to the conclusion that such protection was intended, they interfered not in behalf of the bank, but in behalf of the sanctuary to which it had fled. They decided against the tax; because the subject had been placed beyond the power of the states, by the constitution. They decided, not on account of the subject, but on account of the power that protected it; they decided that a prohibition against destruction was a prohibition against a law involving the power of destruction. The case of the

Providence Bank starts very far in advance of the Bank of the United States. It is not necessary to resort to implication to prove that the rights of the former are protected by the constitution. There is an express clause to that effect, and the court will not forget that it is the prohibition, and not the important or unimportant subject that stands behind it, that constitutes the shield against hostile legislation.

" No state shall enter into any treaty, alliance, or confederation, grant letters of marque and reprisal, coin money, emit bills of credit, make any thing but gold and silver coin a tender in payment of debts, pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts."

" No state shall, without the consent of congress, lay any imposts, or duties on imports and exports, lay any duty of tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another state, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay."

To the framers of the constitution, some of the subjects here prohibited probably appeared to be more important than others. They probably thought it more important to deprive the states of the power of forming alliances with foreign nations, than of emitting bills of credit. The exercise of the one power by the states would merely incommode the general government : the exercise of the other endanger its very existence. Yet are not these subjects, judicially, of equal importance ? Equally important, because equally prohibited. Are not all the prohibited subjects of equal importance, and have the states any more power to violate one prohibition than another ?

It may be said that the Bank of the United States was established by a law of the general government; and that it was the supremacy of the law which rendered all conflicting laws of the states inoperative. The supremacy of the law was a reason, and a conclusive reason, to induce the court to imply a prohibition. It was not the supremacy of the law, but the implied constitutional prohibition, which induced the court to protect the bank. The rights conferred upon the Bank of the United States by its charter, are inviolable

and supreme, as regards all the states. Are not the rights of the Providence Bank, and the law which conferred those rights, inviolable and supreme as regards Rhode Island? Is not that law a contract; those rights the fruit of that contract? What constitutes the supremacy of a law in regard to the states, if it is not their total want of power to interfere with its regular operation, or to destroy the rights which it confers? Can the legislature of Rhode Island repeal the law incorporating the Providence Bank? Can they alter any of its essential provisions? Is it not supreme, or, in homelier English, above their reach? The only difference between the law incorporating the Bank of the United States and the law incorporating the Providence Bank, as regards their character of supremacy, is, that the former is supreme as regards all the states, the latter as regards Rhode Island only. The supremacy of both originates in contract. The fundamental contract of the union, or the constitution, imparts supremacy to the laws of the union, and binds all the states. The contract with the Providence Bank imparts supremacy to all the rights which it confers, and binds one of the states. The sphere of action is more limited, and the parties less numerous in the one case than in the other, and that is the only substantial difference between them.

To the legislature, say the court, in Fletcher *v.* Peck, all legislative power belongs. But the question, whether the act of transferring the property of an individual to the public be in the nature of the legislative power, is well worthy of serious reflection. This language was used in relation to a law of Georgia, attempting to resume the subject of its own grants. Is it not equally applicable to the case before the court? The income of the capitals of the banks is the subject of the grants in this case; land the subject of the grant in that. If a state cannot resume one subject of its grant, can it another? If it cannot resume it directly, can it indirectly? Is there any difference between a direct and a consequential interference with a prohibited subject? The uniform language of this court is in the negative. The warmest advocate for state power will find it difficult to discover any principle from which it can be implied, that one

party to a contract reserves to himself the power of destroying all the rights conferred by the contract.

In relation to individual parties under the law, it will be conceded that no such power can exist. In relation to sovereign parties under the constitution, is not the rule necessarily the same? Is not the dominion of the constitution over the states the same, as to its nature and extent, as that of the law over individuals? If, in a contract between individuals, no illegal power can be impl'od, in a contract with a sovereign can any unconstitutional power be implied? By becoming a party to a contract, a state imposes upon itself additional obligations and additional duties. To suppose that these duties and these obligations do not qualify its rights, is tantamount to denying that they are obligations and duties. To impose upon an individual, or a sovereign, an obligation, without an equivalent limitation of its legal a. moral power, is as impossible, as to produce an effect without a cause. What is an obligation but a limitation of previous power? What is a duty but the abandonment of some corresponding right?

The proposition, that a state has the same power over the rights conferred by its own contract as over all other legal rights, is a denial that any obligation is created by its contract; for, if it creates any obligation, that obligation does not exist in relation to the legal rights of those with whom the state has made no contract. The necessary consequence is, that a limitation of state authority, to the extent of this superadded obligation, must be created; and a limitation which does not exist in relation to the legal rights of others.

Mr Hazzard, for the defendants.

An act of the legislature of Rhode Island, passed in 1791, incorporating the Providence Bank, is said to be a contract between the legislature and that bank; and it is contended, that a general law passed by the legislature in the year 1822, and the acts in amendment thereof, " imposing a duty upon licensed persons and others, and upon bodies corporate, within that state," are laws impairing the obligation of that contract, and violating the constitution of the United States. Whether this be so or not depends upon the question,

Whether there is any thing in the act incorporating the Providence Bank which exempts that bank from the taxing power of the state? Or whether the corporate character of the bank exempts its operations from the action of the state authority?

If the general assembly, by the incorporating act of 1791, or by the acts in addition thereto, did bind the state to exempt this corporation, in perpetuity, from the taxing power of the state, the obligation must either be expressed in those acts, or must be clearly implied from the terms of them; or the exemption must be one of the necessary incidents or immunities of a corporation.

It appears, by the preamble to the charter, that about a year after this bank had been established, its president and directors petitioned the general assembly for an act of incorporation. The prayer of the petition was granted, and an act passed in conformity to it. The act contains a detail of the ordinary properties and capacities of a corporation; such as are alike incident to every corporation of whatever description, and as would appertain to, and be exercised by it, whether expressly granted or not. The act further approves of the private regulations adopted by the company; it exempts the several stockholders from personal liability, beyond the amount of their respective shares of stock. It gives to the company an exclusive, summary, legal process for the collection of debts due to them; and lastly, it makes provision for securing the bills of the bank from forgery. The three acts in amendment make some improvement in the bank process, as it is called; empower the directors to fill vacancies, and provide that the shares of the stockholders shall be held pledged to the bank for their debts due to it.

In these provisions (which are the whole contents of the bank charter) there is no express grant of the exemption claimed, and I am not able to find any thing in them, from which the most remote inference can be drawn, of an intention, on the part of the legislature, to make such a grant. What was granted, and intended to be granted, has no connexion with what is now claimed as part of the grant. All

that was done by the legislature, was to convert a banking co-partnership into a body politic; and their having done this does not warrant the inference that they meant to make to that company a further donation either of money or immunities, other than such as necessarily appertains to all corporate bodies. If there is any thing in that charter from which such an inference can fairly be drawn, it is to be shown by the plaintiffs.

Is then an exemption from the taxing power of the state a necessary incident of this corporation? If it is, it must be an incident of all corporations of every description; for so far as this exemption is the question, there is nothing to distinguish a banking corporation from any other; but if a distinction was to be made, it would not be in favour of banks, which, being moneyed, and money-making institutions, might be considered as the most appropriate objects of taxation.

It is said by the writers on the subject of corporations, that such capacities and qualities as are necessary to the creation and legal being of a corporation, and such only, are incidents of the corporation. But it cannot be said that an exemption from taxes is necessary to the existence of a corporation, especially a moneyed corporation. A corporation is as competent to pay duties imposed upon it as brokers, or retailers, or distillers, or auctioneers, or any other individuals or companies of any other trade, craft, or profession; and its being required to pay them is, in no way, inconsistent with its corporate existence, or its corporate character. Such duties have in fact been imposed upon them, (the banking companies,) by the government of the union; and have been for many years, and still are imposed upon them by many of the states, and no difficulty has been experienced in the collection of them. It is moreover admitted, that when the power of taxing is expressly reserved in the charters of banks, they may consistently be taxed. If this be so, there is nothing in the power of taxing which is inconsistent with the existence of such corporations, or with the full enjoyment of their franchises. It is plain, therefore, that an exemption from taxes is not one of the

necessary incidents ·or immunities of such a corporation. This being the case, and it being ·equally plain (as has already been shown) that the charter· itself of the Providence Bank contains no express or implied relinquishment, on the part of the state, of the power of taxing; it seems to follow, that the acts of the legislature of Rhode Island, "imposing a duty upon· licensed persons and others, and upon bodies corporate within .that state," do not impair the obligation of .any contract of the state with the, plaintiffs, nor violate the constitution of the United States. ·

One of the breaches of contract with which the legislature of Rhode Island is charged by plaintiffs, is thus stated by them : their charter, they say, grants, and secures to them for ever, "all the profits arising from the employment of their capital in banking business." And this· grant, they contend, is impaired by the law of 1822, imposing a tax on the banks. The banks have, no doubt, a perfect right to all the profits to be· derived from the corporate franchises granted to them. But no better right, surely, than other companies or individuals have to all the profits of their business, or to their estates, real and personal, and all the rents and income of them. · And it has not yet been discovered that the exercise of the taxing power upon those subjects was inconsistent with the full enjoyment of those rights.

The power to tax banks for their corporate property, and to tax the stockholders for their stock, is not denied. But it is said that this is a tax upon the franchise; a tax upon the thing granted. The law speaks for itself. It imposes a duty upon the several banks; equal to one-eighth of one per cent of the amount of the capital stocks of each actually paid in. If this is a duty on the franchises, why not? That those franchises are. property, and valuable property, we know. Corporate franchises are thus described by Mr Justice Story, in the Dartmouth College case, 4 Wheat. 700. "They are, properly speaking, legal estates, vested in the corporation itself as soon as it is in esse. They are not mere legal powers granted to the corporation, but powers coupled with an interest. The property of the corporation

vests upon the possession of its franchises. Whatever may be thought of the corporators, it cannot be denied that the corporation has a legal interest in them." He speaks of them elsewhere, in the same case, as "valuable hereditaments or property." And says, "that a grant of them is not distinguishable, in point of principle, from a grant of any other property." And these remarks were made in reference even to eleemosynary corporations; and corporations for literary purposes; and apply much more forcibly to these trading or moneyed corporations. .

The opening counsel will recollect that one of these bank charters was sold in Rhode Island, a few years ago, for a large sum of money, by a company to whom it had been granted several years before, but who had made no use of it. The plaintiffs tell us themselves that their franchises are valuable; and their stock sells for from fifteen to twenty-five per cent advance. And well may it be so. Their interest money is compounded every sixty days: and that too on loans of mere paper bills; which carry no interest. For, as the bills of the banks constitute the whole of the circulating medium; they gain, gratuitously, the interest on so much of their paper as is constantly absorbed in circulation :—the amount of which we know is immense.

It was the opinion of Mr Justice Blackstone, and the soundness of that opinion has been fully tested by the experience of statesmen, that the revenues of a state may be derived from duties and imposts on objects prudently selected, with much less expense and burden to the community, than from direct taxation. What part is it, of the revenues of the United States, that is derived from the latter source ? They have never resorted to direct taxation but on the most pressing occasions, nor until the collection from indirect taxes had proved inadequate to the exigencies of government. From the year 1791 to 1798, and again from 1813 to 1815, laws were passed by congress laying duties on various commodities and trades. But the first direct tax was not laid until 1798, and the second and last not until 1815. Among the objects then thought most appropriate for taxing, all incorporated banks, as well as private bankers,

banking companies and money dealers, were selected for duties; and those duties were regularly and readily paid, without any complaint from the banks of their being incompatible with their corporate existence, or their corporate rights.

There is no weight in the objection that the duty does not bear equally upon the whole community. It is not possible that taxes should be made to bear equally upon every member of the community, so as to draw from each one precisely in proportion to his property.

Nor, if this were practicable, would it be a wise or salutary system of taxation. It is certainly wiser and better to draw revenue from surplus income, than from the immediate products of labour and industry; from commodities and trades which administer to the pleasures or the vices of men, from the luxuries and superfluities, than from the necessaries of life. And thus the United States government began with duties on distilled spirits, on stills, on vendors of wines and spirits, on various articles of luxury, and on banks; and, as long as possible, avoided direct taxes and duties on the more necessary and useful articles, such as household furniture, farming utensils, and the various necessary articles of domestic manufacture.

The true question in this case is, whether the law complained of is a law impairing the obligation of a contract, in the sense those words bear in the constitution of the United States. The power of taxation is " an incident of sovereignty :" and the government in whom it resides is alone competent, within its own jurisdiction, to judge and determine how, in what manner, and upon what objects that power shall be exercised. " That the power of taxation is one of vital importance," said the chief justice of this court, in delivering the opinion of the court in M'Culloch's case, " that it is retained by the states; that it is not abridged by the grant of a similar power to the government of the union, that it is to be concurrently exercised by the two governments; are truths which have never been denied " 4 Wheat. 425. And again, in the same case, " it is admitted that the power of taxing the people and their pro-

perty is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may chose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation." 4 Wheat. 428.

It is admitted that land, or other property, granted by the state, becomes liable to taxes in the hands of the grantees: and that there is no distinction, in point of principle, between a grant of corporate franchises, and a grant of land, or any other property, is conclusively shown by Mr Justice Story, in the Dartmouth College case. 4 Wheat. 684. But land, it is said, exists, and is taxable before the grant. It exists, to be sure; but that circumstance is of no importance: since, as property of the state, it is not taxed, nor is taxable, until granted, any more than ungranted franchises are taxable. It may be said, that, as corporate franchises take their existence only from the grant of them, the legislature can annex to the grant whatever conditions or exemptions they please. If this were true, it would only show that the legislature has power to grant an exemption from taxes in such cases as it may think proper; not that such exemption can be claimed when not granted. As these franchises are, or may be valuable property; the state has an interest in the grants of them, and in the exercise of the taxing and other legislative powers over them, when they are granted, do exist, and are property; as much as it has in the case of any other grants of any other property.

The doctrine contended for by the plaintiffs amounts fully to this, that the powers of legislation must not be exercised, nay, must be annihilated, because they are liable to be abused. True, they would have this doctrine applied only in their own case; but it will hardly be conceded to them, though they so strenuously urge the claim, that they have a right to better security for their franchises than the rest of the community have for their privileges. But,

even if we adopt the plaintiff's application of the doctrine, where will it lead and land us? The power to regulate the public revenue; to fix the rate of interest; to grant charters of incorporation; and to raise revenue by taxation, are branches and incidents of that portion of sovereignty still retained by the states: and are necessary to the very existence of government. But, according to the plaintiffs, all these powers are restrained and controlled, if not surrendered, by the granting of an ordinary act of incorporation to a private trading company; for, if the legislature has power to regulate the currency, it may say that bank bills shall not make part of it; it may say that no bank bills shall issue of a denomination lower than one thousand dollars, or higher than one dollar. If it can fix the rate of interest, it may deprive the banks of their profits; if it can create other banks at pleasure, it may render those already granted of no value; if it can tax the shares of stock in the hands of stockholders, it may effectually break up the business. They profess not to carry their doctrine so far: they concede the exercise of such powers to the state; but, concessions made to save a doctrine from its own tendencies to absurdity, do not alter the principle. The doctrine itself does go the whole length pointed out. The general legislative powers specified do involve in them the power of reducing the profits of the banks, and of affecting their operations and their charters, as fully as such a power is involved in the power of taxing.

The creation of a body politic is an exercise of legislative power; but it does not imply the relinquishment of any other portion of legislative power. The only obligation which the government imposes upon itself is, not unjustly and arbitrarily to defeat the grant contained in the charter: but, it has no more right to defeat any other legal grant, than it has to defeat its own; and, no law which would not impair the obligation of a contract between individuals, would impair it if the state was one of the contracting parties. It makes no difference that individuals cannot grant franchises; for it is already clearly shown, that, in principle, there is no difference between grants of franchises and grants

of other property. It is not wholesome doctrine for private corporations to imbibe, that they are independent of the power that creates them; and that they shall be protected in setting it at defiance. Not only are their franchises and other property subject to the taxing power of states; but, so far as the public interests are affected by the action of a corporation, so far those operations must be under the control of government, whose province and paramount duty it is to provide for the public welfare. Thus, should the public good require the suppression of a paper currency, certainly the government would have a right to suppress it, although, in doing so, they would destroy the banks whose paper composes that currency. It will not do to say that a chartered military company may not be put down, or, that a chartered company engaged in supplying a city with water, or any such corporations, may not be suppressed, if the government should see good cause for suppressing them: and, in point of character, there is no difference between those corporations and banking corporations whose paper bills constitute the public money currency of the country. In the case of the Corporation of the Protestant Episcopal Church vs. The City of New York, decided by the supreme court of the state of New York, and reported in 7 Cowen, 584; and in a similar case, of another church congregation against that city, reported in 5 Cowen, 538, it was decided; that a bye-law of the city, forbidding the interment of the dead in the cemeteries and grounds appertaining to the churches, was valid and constitutional, although those grounds had been granted by the city itself for that express use, and the grants contained covenants for quiet enjoyment, and although certain private rights and pecuniary interests of individuals were cut off by that law: and it was decided in those cases, that the city corporation could not, by its agreement, abridge its legislative powers. In the case of Brown vs. The Penobscot Bank, 8 Mass. 445, it was decided that a law, imposing a heavy penalty upon banks which did not punctually redeem their bills, was valid; and in Foster vs. The Essex Bank, 16 Mass. 128, a law was decided to be valid, which, for the purpose of giving time for remedies against a bank prolonged its corporate existence, against

its wishes, for the space of three years after its charter had expired.

There is another question, a most important one, which must always present itself in a case like the present. That question is, whether any legislature can, if it would, grant or surrender any portion of that power of which sovereignty itself consists? No one can entertain a doubt that the existing legislature must have full power to make all such grants of public lands or other property; and to enter into all such contracts, as this court declared to be binding and valid in the cases of Fletcher *vs.* Peck, Terrett *vs.* Taylor, and other similar cases. But such grants and contracts, it appears, are very different from an alienation, in perpetuity, of a portion of the taxing power of the state; which, in another case, this court declared to be "an incident of sovereignty," and "essential to the existence of government."

There are certain powers which are inherent in the people, and cannot be alienated, even by the people themselves, much less by their representatives, to whom those powers are entrusted for a time; not to be annihilated, but to be exercised by them, until other representatives shall be appointed in their places. The present generation of men may sell or bind themselves to servitude; but they cannot sell or bind their posterity.

It is immaterial whether the legislature is restrained by a written constitution or not. The absolute rights of the constituents are not to be encroached upon, because they may not think it necessary to attempt to guard them by such instruments, which, after all, but very indifferently answer the purpose for which they are intended; but on the contrary are too often made use of, by false and forced constructions, to justify the assumption of powers which the people never meant to grant.

The power of self government is a power absolute and inherent in the people. But that power cannot exist distinct from the power of taxation. If the legislature can exempt, for ever, all corporations from taxes; they can exempt all merchants, all farmers, all manufacturers, or all of any other classes of the community. And, in this way, they can cut

off the sources of future revenue; and can fasten and entail for ever the whole burthen of government upon any portion of the people they please.

In the argument, the sentiments frequently expressed by this court, and by different members of it, on various occasions, seem to have been forgotten. "The question whether a law be void for its repugnance to the constitution," said the chief justice of this court, in the case of Fletcher *vs.* Peck, "is at all times a question of great delicacy; which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." "The opposition between the constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other." And in the Dartmouth College case, 4 Wheat. 125, "on more than one occasion the court has expressed the cautious circumspection with which it approaches the consideration of such questions: and has declared that in no doubtful case would it pronounce a legislative act to be contrary to the constitution." In Calder *vs.* Bull, 3 Dall. 386, it is said, by the late Mr Justice Chase, "if ever I exercise the jurisdiction, I will never decide any law to be void but in a very clear case." And by the late Mr Justice Iredell, in the same case: "the court will never resort to that authority, but in a clear and urgent case." And in Cooper *vs.* Telfair, 4 Dall. 14, by the late Mr Justice Patterson: "to authorise this court to pronounce any law to be void, it must be a clear, unequivocal breach of the constitution; not a doubtful and argumentative implication."

Mr Jones in reply argued that,

The term "*contracts*," used in the constitution, comprehends as well those between two states, or between a state and private individuals, as those between two or more private individuals, citizens or not citizens of the state, the validity of whose law is drawn in question.

It comprehends not only such as remain executory or in action, but all vested rights and interests in any species of property, corporeal or incorporeal; and, among these, the franchises and property of private corporations, whether cre-

ated for any expressed consideration of definite value, or for any declared objects of public utility.; or purporting to be merely gratuitous, as between grantor and grantee; the implied benefits to the community being the only compensation supposed to be given or received; even donations from the state, or individuals, to eleemosynary and religious institutions, or to others of public beneficence or utility, whether incorporate or unincorporate.

It matters not by what means, or in what form the contract is created, or the rights vested; whether by charter or grant from the state, after it became sovereign and independent; or during its colonial state, from the crown; or by a law in the ordinary form of legislative enactment: they are all equally protected by the constitutional prohibition.

This constitutional sanction rests not on the good faith supposed, by the comity of sovereigns, to inform the breasts of each other; nor upon the dread appeal to that ultima ratio, which is ordinarily the only means of compulsory redress among themselves: but it acts, directly and practically upon state power and jurisdiction; and enables the tribunals to set aside the obnoxious law, and to uphold and enforce, by judicial coercion, the rights it attempts to violate.

It matters not what the kind or degree of force exerted by the law upon the contract, or the vested right; whether it go directly and wholly to annul the one, or to destroy the other; or in any degree to impair or injure it; or to exert any authority over it, necessarily involving, and insepa- rably inherent to an authority to annul, destroy or impair it: any compulsory change in the terms of the contract, or in the essential condition of the vested right, whether posi- tively injurious or even positively beneficial, is within the same reason, and equally prohibited to the states.

The numerous decisions of this court, by which these principles have been judicially established; are too recent and familiar to require any particular reference. Their authority precludes all judicial question, and dispenses with all proof of the axioms deduced from them.

" Taxes (as accurately classed by writers on political economy,) are either direct or indirect: direct, when im-

mediately taken from income or capital; indirect, when taken from them, by making the owners pay for liberty to use certain articles, or to exercise certain privileges."

When, therefore, the bank is made to pay for liberty to exercise the privilege of employing a certain capital in the trade of banking, or of exerting any other of its chartered faculties; doubtless an indirect taxation of the capital itself, in what species of property soever consisting, results. But the converse of the proposition does not hold, that a direct tax, in the ordinary mode of taxation, upon the capital of individuals invested in bank stock, or upon the product of the skill and labour bestowed in the employment of that capital, or upon the lands, ships, merchandize, or other specific property held by the bank for the benefit of the individual stockholders; necessarily operates, directly or indirectly, any duty or burthen whatever, on the corporate franchise itself, or the liberty to exercise the privileges conferred by the charter. The very material difference between the two modes of taxation, as they respectively affect the substantial terms of the charter, and the essential condition of the rights vested by it, will be presently considered. The simple proposition, that it is a duty imposed, specifically, on the corporate franchise, and the faculties and privileges with which the body corporate is endued by its charter, is what is now to be proved.

This is conceived to be clear from the import of the law itself.

The tax is laid directly on the bank, in its corporate capacity; and the stock, belonging to individuals, is made the mere measure of the imposition on the aggregate body. This stock is not the property of the body taxed; but is divided into distinct and separate shares, which belong to the several owners, as their separate, individual estate, and subject to the independent disposal of each owner; as were the several capitals, represented by the stock, before they were subscribed to the stock, and while they subsisted in the original form of money. The capital paid in and represented by the stock, is entrusted to the custody and husbandry of

the corporation; but, that artificial and transferable commodity, brought into life by the charter, endued with all its faculties by the charter, and denominated bank stock, is just as much the separate property, and at the disposal of the respective owners, clear of all corporate control, as their several lands, chattels and choses in action. This quality of the stock is just as distinctly guarantied to the stockholders individually, as is the corporate franchise, or any of its faculties, to the aggregate body. There is nothing of the social property or possession incident to partnership. Then, the property of one person is merely adopted as an arbitrary measure of the quantum of taxation on another. There is no more of indirect taxation upon the bank stock held by individuals, and thus made the arbitrary measure of taxation, than upon the lands, ships, choses in action, or other property held by the aggregate body for the benefit of the several corporators, but not comprehended in the rule of admeasurement for determining the mere quantum of taxation. The indirect effect upon all is precisely the same. But this indirect operation of the tax does not go, in the least degree, to relieve any one article of the property, nor any one of the proprietors affected by the operation from the general law of taxation operating upon them, in common with their fellow citizens. Under that general law, all the property, of every species, held by the corporation for the benefit of the stockholders, is rated, *qua* property, in the common process of taxation; just the same as if the franchise or chartered faculties of the corporation had not been taxed at all : so are the money capitals, invested in and represented by the shares of bank stock, and the products received in the form of dividends : all being still liable to be rated in the general taxation upon capital and income, without the least allowance for what is indirectly abstracted by the duty on the corporate body. This duty, therefore, does not even affect to be a circuitous mode of more conveniently taxing property, in any form of fixed or of commercial capital, or of income. It is no part of any general system, either of a property tax, or an income tax; but is solely and exclusively directed to

the chartered liberty or privilege of a certain mode of arti-ficial existence, and of exercising the peculiar faculties of that mode of existence. The tax is just as effective in terms and in obligation, whether the corporation, *qua* proprietor, own millions or nothing; whether the capital stock be at cent per cent advance, or the capital invested in it be utterly lost and sunk in the course of trade; whether the income, in the form of dividends, be large or small, or nothing. The amount of capital stock paid in, is the unvarying standard of the duty on the bank; the actual state and condition of the bank, or of the stockholders as proprietors, enters not at all into the scheme of the duty. Then, how can the bare contingency, that it may be one of the incidents and consequences of the scheme, indirectly, to burthen the property of the bank, or of the stockholders, make this any the less a duty directed specifically, nay exclusively, to the continued enjoyment of the corporate franchise, to which it attaches itself, independent of every consideration of property.

The original grant of this franchise to the bank is admitted, it is presumed, to be in the nature of a contract between the state and the corporation, within the meaning of the constitution; and, it is further presumed to be admitted, notwithstanding a good deal of ambiguity on this point in the opposite argument, that this contract, with all the peculiar rights and privileges vested under it, is of paramount obligation, and altogether irrevocable and indefeasible by any subsequent act of legislation. Admitted or denied, it cannot, at this day, be treated as a subject of controversy, unless this court should please to intimate a wish to review and reconsider the principles of former decisions. The obligation of the contract, if it means any thing, means that the corporation shall always enjoy the franchise, with all the faculties, rights and privileges vested by the grant, upon the identical terms and conditions of that grant. The question then is a practical one. Does the law of 1822, against the consent of the grantee, materially change the original terms of the grant, or the condition of the rights vested by it? In either case, it equally impairs the obligation of the contract, within the meaning of the constitution.

One of the most material terms of a contract or grant is the consideration. The grant of a franchise is either in some sort gratuitous, as if founded on the implied consideration of diffusive benefits to the community, or on the expressed consideration of public utility; or of some pecuniary or other equivalent, of definite value. In either case it is equally binding and indefeasible, without the consent of both parties. If, being gratuitous, it be burthened with a price; or if, being for valuable consideration, the price be arbitrarily increased, who can doubt that the terms of the contract are materially changed? And if this be done by the retrospective operation of a law, arbitrarily imposing such new terms, who can doubt that the obligation of the contract is injuriously impaired, if not destroyed?

The case of land purchased from the state being liable to taxation, in common with the land of other individuals, is put as an argument, in point, against us. No one ever imagined that a change in the condition of the land, from public to private domain, necessarily annexed any pre-eminent privileges to it. So we admit, without qualification, that all property held by the bank, by virtue of its charter, is taxable in common with other property of the like description. So this court admitted was the condition of the property held by the Bank of the United States, though the bank itself, or its franchises and privileges were not so. But suppose the legislature, by a retrospective law, instead of subjecting the land to the general law of taxation, tax the grant itself, the title to hold and enjoy the land, and exact from the grantee, over and above the original consideration, a new compensation for parting with the title of the public to an individual : or, what is the same thing, select his particular land from the mass of other taxable lands, and besides the general tax contributed for it by the proprietor, in common with other proprietors of lands, exact an additional tax on his, because his title or grant was derived from the state ; so as, in effect, to tax the grant itself, or the right, before granted, to hold and enjoy the land : this would be a clear infringement of the contract, as being a material and

injurious change in its terms : in effect, the exaction of an additional compensaton for the grant.

Next, we are to examine the state and condition of the right vested by the grant ; and see if that is subjected by the law in question to any material change from the state and condition in which the grant originally placed it.

This must be determined by the nature and extent of the vested right, then and now.

It is not at this day to be disputed, that the grant imports a contract that the grantees shall absolutely and fully enjoy the liberty to exercise all the privileges and faculties, either expressed in the grant or incident to its nature, unrevoked and undiminished ; in short, that these privileges and faculties shall continue while the corporation endures, of the same extent and of the specific quality as when originally conferred, without any hindrance, impediment or molestation, on the part of the grantor. The implied covenants of the grant are just as strong and obligatory as those covenants of title in an ordinary bargain and sale, that go to tie up the hands of the bargainor himself, and of all claiming under him or acting by his authority. For instance : the covenants against incumbrances, &c. and for quiet enjoyment, without the let, molestation, hindrance, &c. of the bargainor, &c. The granted liberties and franchises cannot be destroyed or taken away, in the whole or in part ; consequently, they cannot be altered or diminished in kind or in degree ; for he who has a discretion to alter or diminish, necessarily has a discretion to destroy, unless the limits of his discretion be stipulated in the grant. It is not the mere quantum of the injury to the grantee, nor the degree in which the terms and conditions of the contract are transgressed, that determines the rightfulness of the act. Once admit a discretionary power, in any degree, as resulting from the relation of the parties, and not from the limitations of the contract, and it can be nothing but an unlimited discretion. The granted liberties and faculties cannot be afterwards clogged with any new conditions or incumbrances, that may either stop or retard their action ; neither a molehill nor a mountain can be raised in their path. This is the

irresistible and universal conclusion of reason; and sanctioned, if it wanted sanction, by the reasoning and the decision of this court in Green *vs.* Biddle, 8 Wheat. 84.

Then, is not the exaction of a tax, or, in other words of an additional compensation to the state, for the chartered liberty, as efficient an instrument, either for the destruction or the diminution of the liberty, as any that could be devised? What is there that could more effectually stop or retard its chartered course? It depends entirely upon the weight of the burthen, whether the party, on whom it is imposed, sink under it, or be measurably impeded and retarded. In mercantile language, it may occasion a partial loss of one per cent, or a total loss of one hundred per cent; and, in principle, does it matter which? The question is not, whether the tax be exorbitant or oppressive. Of that no judicative tribunal can possibly be the judge. If the discretion to tax at all rest with the legislature, the discretion is, in the nature of things, unlimited. It is impossible for any but the delegated depositaries of the power to tax, and their constituents to judge and determine what tax is reasonable or exorbitant. What might be a light burthen to one bank might overwhelm another. Once determine that a discretionary power to impose the burthen in any degree exists, and the judicial power is for ever gone to control it in any degree.

Then these postulates may be taken for granted,

1. That the imposition of a new tax or burthen on the liberty, in any degree, measurably clogs and impedes the practical exercise of that liberty, and so diminishes it.

2. That such tax or burthen is an instrument equally efficient to destroy as to diminish the liberty, according to the kind and degree of force with which the instrument is used.

3. That it rests in the absolute discretion of the legislature to use it, either for the one purpose or the other, if at all.

The conclusion is inevitable, that, if it may be used at all, the exercise of the liberty, in any degree, and its very existence, rest upon sovereign discretion, not on the faith of a contract. This amounts either to a negation of the postulate with which we set out, that the grant of the liberty is

in the nature of a contract; or to an exclusion of all contracts from the sanction and protection of the constitution: or to an exception of this particular contract from the condition of contracts in general.

The ground or reason of such exception is not stated, and is altogether beyond comprehension.

Then, if the law of 1822 be borne out in the imposition of this new burthen on the liberty to exercise the privileges of the franchise, the change effected in the state or condition of the franchise, as it stood under the original law of the contract, and as it stands under the subsequent modification of that law, is this: originally, the contract under which it was held was consummate and executed; now, one, at least, of its most material terms, the consideration, is executory and contingent, and, what is worse, discretionary with the other party: originally, the exercise of the franchise, within its chartered limits, was absolutely free and unrestrained; now, burthened with new impositions, and liable to be further burthened, ad infinitum: originally, the liberty and right so to exercise the privileges and faculties of the franchise, were absolute, unconditional, and indefeasible; now, at the sovereign will and pleasure of the legislature.

The franchise is not like the proper subjects of political power intrusted to legislative discretion at all; but, to the positive sanction of public faith, tied down by the inviolable obligation of contract. Indeed, an abuse of legislative power, in oppressing the great mass of the community by exorbitant taxation, far less in confiscating all its property, is scarce an admissible supposition. The mass of the community holds, in its own hands, the remedy against its own oppression, and the abuses of its rulers: but the great conservative principle of political responsibility may act very feebly, or not at all, in protecting and enforcing the particular rights and obligations of contracts against violation by the government. It is, therefore, that political rights, and the vested rights of contract and property, are placed on different bases, and protected by different sanctions. The administration of any political power must, in the nature of things, be more or less discretionary; and can give no guarantee against abuse, but the responsibility inseparable from

delegated power : the rights and obligations of contracts, on the other hand, are no subjects of political trust or discretion at all; but just as positive and coercive upon the party that happens to be a sovereign state, as upon an individual.

An objection somewhat novel is started, which goes to limit and restrict, instead of enlarging, state power, by denying its competency to make such a contract as we say it has made in this case. The state cannot, it seems, alienate or part with its sovereign power, in whole or in part. Taxation is an incident of its highest sovereign power, and cannot be aliened by contract; therefore, a contract to exempt any particular person or species of property from taxation is void.

To say nothing of the evident inconsequence of the conclusion from the premises, and of the inaccuracy of holding, that the constitutional incompetency of a state to lay new exactions upon its own contracts, and upon the mere abstract rights of contract, created by the state itself, is the same thing as a substantive stipulation to exempt property, in its nature an appropriate and legitimate subject of taxation ; we may wonder why the axe was not applied to the root of the bank charter. For, surely, the principle of the objection goes that length : since the franchise itself is carved out of the eminent domain, or transcendental propriety of the state ; and is a portion of it, aliened and bestowed upon every corporation; and no small portion of it is parted with, when municipal corporations are created.

But it should not have escaped the learned counsel that the state legislature of New Jersey was held bound by a contract of its predecessor, the colonial legislature, divesting itself of a portion of this very incident of high sovereignty, taxation, as it applied to certain lands belonging to citizens of the state, and constituting as appropriate a subject of taxation in general, as can be imagined. This, not as he supposes, because of any peculiar dignity or sanctity attached to a treaty half a century before, between the former colony and the poor remnant of a broken tribe of Indians ; but, upon the ground of contract simply : which, indeed, is the only intelligible ground for the obligation of treaties,

upon the parties to them. It might also have been recollected, that the legislature of New Jersey, in the instance just stated, and of Georgia, in the case of the Yazoo lands, were held to have conclusively renounced by contract, and by its *implied*, not its *express* stipulations, the exercise of one of the highest and most indispensable prerogatives of legislation; that of repealing its own laws.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of error to a judgment rendered in the highest court for the state of Rhode Island, in an action of trespass brought by the plaintiff in error against the defendant.

In November 1791 the legislature of Rhode Island grant a charter of incorporation to certain individuals, who had associated themselves together for the purpose of forming a banking company. They are incorporated by the name of the " President, Directors, and Company of the Providence Bank;" and have the ordinary powers which are supposed to be necessary for the usual objects of such associations.

In 1822 the legislature of Rhode Island passed " an act imposing a duty on licensed persons and others, and bodies corporate within the state;" in which, among other things, it is enacted that there shall be paid, for the use of the state, by each and every bank within the state, except the Bank of the United States, the sum of fifty cents on each and every thousand dollars of the capital stock actually paid in." This tax was afterwards augmented to one dollar and twenty-five cents.

The Providence Bank, having determined to resist the payment of this tax, brought an action of trespass against the officers by whom a warrant of distress was issued against and served upon the property of the bank, in pursuance of the law. The defendants justify the taking set out in the declaration under the act of assembly imposing the tax; to which plea the plaintiffs demur, and assign for cause of demurrer that the act is repugnant to the constitution of the United States, inasmuch as it impairs the obligation of the contract created by their charter of incorporation. Judg-

ment was given by the court of common pleas in favour of the defendants; which judgment was, on-appeal, confirmed by the supreme judicial court of the state: that judgment has been brought before this court by a writ of error.

It has been settled that a contract entered into between a state and an individual, is as fully protected by the tenth section of the first article of the constitution, as a contract between two individuals; and it is not denied that a charter incorporating a bank is a contract. Is this contract impaired by taxing the banks of the state?

This question is to be answered by the charter itself.

It contains no stipulation promising exemption from taxation. The state, then, has made no express contract which has been impaired by the act of which the plaintiffs complain. No words have been found in the charter, which, in themselves, would justify the opinion that the power of taxation was in the view of either of the parties; and that an exemption of it was intended, though not expressed. The plaintiffs find great difficulty in showing that the charter contains a promise, either express or implied, not to tax the bank. The elaborate and ingenious argument which has been urged amounts, in substance, to this. The charter authorises the bank to employ its capital in banking transactions, for the benefit of the stockholders. It binds the state to permit these transactions for this object. Any law arresting directly the operations of the bank would violate this obligation, and would come within the prohibition of the constitution. But, as that cannot be done circuitously which may not be done directly, the charter restrains the state from passing any act which may indirectly destroy the profits of the bank. A power to tax the bank may unquestionably be carried to such an excess as to take all its profits, and still more than its profits for the use of the state; and consequently destroy the institution. Now, whatever may be the rule of expediency, the constitutionality of a measure depends, not on the degree of its exercise, but on its principle. A power therefore which may in effect destroy the charter, is inconsistent with it; and is impliedly renounced by granting it. Such a power cannot be exercised without im-

pairing the obligation of the contract. When pushed to its extreme point, or exercised in moderation, it is the same power, and is hostile to the rights granted by the charter. This is substantially the argument for the bank. The plaintiffs cite and rely on several sentiments expressed, on various occasions by this court, in support of these positions.

The claim of the Providence Bank is certainly of the first impression. The power of taxing moneyed corporations has been frequently exercised; and has never before, so far as is known, been resisted. Its novelty, however, furnishes no conclusive argument against it.

That the taxing power is of vital importance; that it is essential to the existence of government; are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a state may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist: but as the whole community is interested in retaining it undiminished; that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear.

The plaintiffs would give to this charter the same construction as if it contained a clause exempting the bank from taxation on its stock in trade. But can it be supposed that such a clause would not enlarge its privileges? They contend that it must be implied; because the power to tax may be so wielded as to defeat the purpose for which the charter was granted. And may not this be said with equal truth of other legislative powers? Does it not also apply with equal force to every incorporated company? A company may be incorporated for the purpose of trading in goods as well as trading in money. If the policy of the state should lead to the imposition of a tax on unincorporated companies, could those which might be incorporated claim an exemption, in virtue of a charter which does not indicate such an intention? The time may come when a duty may be imposed on

Vol. IV.—3 V

manufactures. Would an incorporated company be exempted from this duty, as the mere consequence of its charter?

The great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men. This capacity is always given to such a body. Any privileges which may exempt it from the burthens common to individuals, do not flow necessarily from the charter, but must be expressed in it, or they do not exist.

If the power of taxation is inconsistent with the charter, because it may be so exercised as to destroy the object for which the charter is given; it is equally inconsistent with every other charter, because it is equally capable of working the destruction of the objects for which every other charter is given. If the grant of a power to trade in money to a given amount, implies an exemption of the stock in trade from taxation, because the tax may absorb all the profits; then the grant of any other thing implies the same exemption; for that thing may be taxed to an extent which will render it totally unprofitable to the grantee. Land, for example, has, in many, perhaps in all the states, been granted by government since the adoption of the constitution. This grant is a contract, the object of which is that the profits issuing from it shall enure to the benefit of the grantee. Yet the power of taxation may be carried so far as to absorb these profits. Does this impair the obligation of the contract? The idea is rejected by all; and the proposition appears so extravagant, that it is difficult to admit any resemblance in the cases. And yet if the proposition for which the plaintiffs contend be true, it carries us to this point. That proposition is, that a power which is in itself capable of being exerted to the total destruction of the grant, is inconsistent with the grant; and is therefore impliedly relinquished by the grantor, though the language of the instrument contains no allusion to the subject. If this be an abstract truth, it may be supposed universal. But it is not universal; and therefore its truth cannot be admitted, in these broad terms, in any case. We must look for the exemption in the language of the instrument; and if we do

not find it there, it would be going very far to insert it by construction.

The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all, for the benefit of all. It resides in government as a part of itself, and need not be reserved when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right, that it must bear a portion of the public burthens; and that portion must be determined by the legislature. This vital power may be abused; but the constitution of the United States was not intended to furnish the corrective for every abuse of power which may be committed by the state governments. The interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security, where there is no express contract, against unjust and excessive taxation; as well as against unwise legislation generally. This principle was laid down in the case of M'Cullough *vs.* The State of Maryland, and in Osborn et al. *vs.* The Bank of the United States. Both those cases, we think, proceeded on the admission that an incorporated bank, unless its charter shall express the exemption, is no more exempted from taxation, than an unincorporated company would be, carrying on the same business.

The case of Fletcher *vs.* Peck has been cited; but in that case the legislature of Georgia passed an act to annul its grant. The case of the State of New Jersey *vs.* Wilson has been also mentioned; but in that case the stipulation exempting the land from taxation, was made in express words.

The reasoning of the court in the case of M'Cullough *vs.* The State of Maryland has been applied to this case; but the court itself appears to have provided against this application. Its opinion in that case, as well as in Osborn et al. *vs.* The Bank of the United States, was founded, expressly, on the supremacy of the laws of congress, and the necessary consequence of that supremacy to exempt its instruments employ-

ed. in the execution of its powers, from the operation of any intefering power whatever. In reasoning on the argument that the power of taxation was not confined to the people and property of a state, but might be exercised on every object brought within its jurisdiction, this court admitted the truth of the proposition; and added, that " the power was an incident of sovereignty, and was co-extensive with that to which it was an incident. All powers, the court said, over which the sovereign power of a state extends, are subjects of taxation. The sovereignty of a state extends to every thing which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by congress to carry into execution powers con-. ferred on that body by the people of the United States? We think not.

So in the case of Osborn vs. The Bank of the United States, the court said, " the argument" in favour of the right of the state to tax the bank, " supposes the corporation to have been originated for the management of an individual concern, to be founded upon contract between individuals, having private trade and private profit for its great end and principal object.

If these premises were true, the conclusion drawn from them would be inevitable. This mere private corporation. gaged in its own business, would certainly be subject to the taxing power of the state as any individual would be."

The court was certainly not discussing the question whether a tax imposed by a state on a bank chartered by itself, impaired the obligation of its contract; and these opinions are not conclusive as they would be had they been delivered in such a case: but they show that the question was not considered as doubtful, and that inferences drawn from general expressions pointed to a different subject cannot be correctly drawn.

We have reflected seriously on this case, and are of opinion that the act of the legislature of Rhode Island, passed in 1822, imposing a duty on licensed persons and others, and bodies corporate within the state, does not impair the obligation of the contract created by the charter granted to the

[Providence Bank *vs.* Billings and Pittman.]

plaintiffs in error. It is therefore the opinion of this court, that there is no error in the judgment of the supreme judicial court for the state of Rhode Island, affirming the judgment of the circuit court in this case; and the same is affirmed; and the cause is remanded to the said supreme judicial court, that its judgment may be finally entered.

This cause came on to be heard on the transcript of the record from the supreme judicial court of the state of Rhode Island and Providence plantations, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said supreme judicial court in this cause be, and the same is hereby affirmed, with costs.