### IN THE

# COURT OF APPEALS

### OF

# MARYLAND.

———————

JUNE TERM, 1845.

WM. BURTON, EX-PARTE.—G. H. BRICE *vs.* THE STATE.—
C. C. JAMESON *vs.* THE STATE.—C. C. JAMESON *vs.* THE
STATE.—*June* 1845.

Under the act of 1844, ch. 280, the bonds of trustees, executors, and administrators, conditioned for the faithful performance of their official duties, are not required to be stamped.

Neither is a check of a bank in this State, upon a bank in another State, at sight, or otherwise, nor a certificate of deposite given by a bank.

The terms, "bonds and obligations" in that act, are to be confined to such as are given for the payment of money.

The banks of this State are secured in the privilege of issuing checks, bills of exchange, and certificates of deposite.

The original charters of the "*old banks*," as they are termed, will expire on the 10th March 1846.

Under the act of 1844, ch. 280, a mortgage, without a covenant to pay the debt secured; a lease on which is reserved a rent in money, or in specifics; an assignment of property, in consideration of an annuity, to be paid by the grantee for the life of the grantor; an order or draft not sold, nor intended to be put into circulation, but made solely to obtain possession by the party of his own funds, are not required to be stamped.

A mortgage with a covenant, to pay the debt secured; a due bill, or written acknowledgment of indebtedness to a certain extent; an account stated, signed by the parties, or by the party to be charged, as evidence of debt, are required to be stamped.

1    v.3

APPEALS, &c.

The *first* of these appeals was from the *Orphans* court of *Baltimore* county, and arose upon the application of *William Burton*, for letters of administration on the estate of *Ephraim Sims*. The court had adjudged that the applicant was entitled to letters; he then tendered a bond with securities satisfactory to the court, and offered to take the oaths of office, but as the bond *was not stamped*, according to the act of 1844, ch. 280, the court, on that ground alone, refused to approve of it; *Burton* appealed to this court.

The *second* was a writ of error to *Baltimore* city court, sued out by *G. H. Brice*, against whom proceedings had been instituted for unlawfully signing, sealing, and delivering an unstamped bond in the penalty of $2000, with condition well and faithfully to perform a trust reposed in him for the sale of certain real property by *Baltimore county court*, sitting as a court of equity.

The *third* case arose upon the following unstamped check:

"BANK OF BALTIMORE, *Baltimore, June 2nd,* 1845.

"No. 2755.—Cashier of the *Manhattan Co., N. York.* Pay to the order of *Jas. H. McCulloh*, Pres't, one thousand dollars. $1000.                    C. C. JAMESON, Cash'r."

The *fourth* was upon an unstamped certificate of deposite, viz:

"Certificate of Deposit, *Bank of Baltimore.*
$1000.                    BANK OF BALTIMORE, *June 2nd* 1845.

*Dr. J. H. McCulloh* has credit at the *Bank of Baltimore*, for one thousand dollars, subject to his order on the return of this certificate, deposited by himself.
No. 705.                    C. C. JAMESON, Cash'r."

*Brice* and *Jameson* filed a general demurrer to these proceedings, and the *City court* rendered judgment for the State.

The act of 1844, ch. 280, enacts, "there shall be levied, collected, and paid, the several stamp duties following, viz: for every piece of paper &c., upon which shall be printed or written, any or either of the instruments following, to wit: on any bond, obligation, single bill or promissory note, or notes, made

or executed in this State, above $100, and not made or issued by any incorporated bank ; and on any foreign or inland bill of exchange, or other evidence of debt, whether endorsed or otherwise, and whether made or issued by any incorporated institution, individual or firm, according to the following scale," &c.

These causes were argued together, before ARCHER, C. J., DORSEY, CHAMBERS, MAGRUDER, and MARTIN, J.

By S. J. DONALDSON for the appellees, cited *Hughes vs. King*, 2 *Serg. and Low*, 322. *Jones and Hirst vs. Simpson*, 9 *S. and Low*, 99. 1 *Kent Com.*, 461. *Faw vs. Marsteller*, 2 *Cranch*, 10. *Brig Aurora vs. The U. States*, 7 *Cranch*, 382. 2 *Step. N. P.*, 1241. *Annandale vs. Pattison*, 9 *B. and Cres.*, 919. *Bowen vs. Ashley*, 4 *Boss. and Pull*, 274, 278, 279.

RICHARDSON, Att'y General, 1 *Starkie Rep*, 322. *Davis vs. Ostrander*, 1 *John. Cases*, 106. *Somerset vs. Dighton*, 12 *Mass.* 384. *Head vs. Providence Insu. Co.*, 2 *Cranch*, 127. 7 *Mass.*, 524. *Pearce vs. Atwood*, 13 *Mass.*, 343. *Byrne vs. Crowninshield*, 1 *Pick.*, 261. 1 *Whart. Dig.*, 708. *Co. Lit.*, 172, *a. Bartlett, et al. vs. Kings Exrs.*, 12 *Mass.*, 545. *Ellis vs. Paige, et al.*, 1 *Pick*, 45. 3 *A. and Ames on Corp.*, 3. *Providence Bank vs. Pittman*, 4 *Peter*, 514.

R. JOHNSON, in reply, cited *Preston vs. Browder*, 1 *Wheat.*, 115. *Calder and Wife vs. Bull and Wife*, 3 *Dallas*, 386.

MAGRUDER, J., delivered his opinion as follows:

These several cases, although they present different questions, have been argued together, and will be disposed of at the same time. All of them arise under the act of Assembly of 1844, chap. 280.

With respect to one of the appeals by *G. H. Brice*, the court below erred, in deciding that the bond tendered required a stamp. It is a bond with a collateral condition, and no bonds of that description are required by the act of Assembly to be stamped. It is true that such bonds, like others, are obligations, but they do not oblige the obligors to pay any sum

of money.   They are taken to secure the performance of some duty, not the payment of money.   It is impossible therefore to tell, upon which of the stamps mentioned in the law, official or other bonds, for the performance of any duty, are to be written, or to say that they are obligated to pay above one hundred dollars.   It is true that there is a sum of money mentioned in these bonds, but this is mentioned as the penalty; and the penalty, at the time of the execution of the bond, is not a debt.   If it was, then, a bond given for the payment of money due, would require a larger stamp than a single, or even penal bill, for the same debt.   If the bond had been received, and either of the obligors had died, it would have been no voucher or proof of a claim against his estate.   If a suit was instituted upon such a bond, in order to sustain the action, other proof than that of the execution and delivery of the bond would be necessary.   In addition to this it would have been necessary to prove a breach of the condition of the bond, which, of course, must have been committed subsequently to its execution, and then, not the penalty, but damages for the alleged breach of the condition, (to be ascertained by a jury,) would be recovered.

A recognizance taken in or out of court, for the appearance of a person, is an obligation, just as much as the bond in this case ; yet surely it will not be said, that a recognizance must be written on a stamp.

Formerly, indeed, on the forfeiture of a bond the whole penalty was recoverable, but not until there had been a breach of the condition.   Upon a bond conditioned for the payment of rent, the penal sum could not be recovered, or claimed, until the rent was due ; and upon a bond given by an administrator, no suit can be brought until the administrator has done, or omitted to do some act, which is a breach of the condition.

A mortgage mentions a sum of money to be due by the mortgagor to the mortgagee, but still it is not an obligation to pay the money, but merely a conveyance of property to secure its payment.   "No action of covenant will lie on the proviso or condition in the mortgage ; and the remedy of the mortgagee for non-payment of the money, according to the proviso,

would seem to be confined to the land where the mortgage is without any express covenant or separate instrument." 4 *Kent*, 139. But if the mortgage contains a covenant to pay the debt, then it must be on a stamp ; not because it is a mortgage, but because besides a mortgage, it is an obligation to pay a certain sum of money.

If there be an express covenant to pay the debt, a stamp is requisite, although the mortgage has a bond or note for the payment of the same, and on stamped paper. This is be-cause the law requires that every obligation, (if the sum exceeds one hundred dollars,) shall be written upon a stamp ; and does not make in favor of a creditor, who is about to take a covenant in addition to a bond, the same exception which is made in the case of more than one bill of exchange. These remarks are designed to show, what obligations must be written upon stamped paper; and that no obligation like the one in this record, need to be stamped. The same is to be said of the trustee's bond.

In one other of the cases, it was claimed in behalf of the State, that foreign bills of exchange, though issued by a bank of *Baltimore*, must be upon stamped paper. This claim is resisted, not upon the ground that the act of the last session does not require such bills of exchange to be written upon a stamp, (it must be admitted that it does,) but, because the legislature had not the power to enact such a law. It is insisted, that the legisture has parted with the power thus to tax (as it is called,) the banks of *Baltimore :* and if not all of them, certain banks of that city, of which the bank that issued the bill of exchange, in the record, is one.

We are then to decide a grave and solemn question indeed. We are asked to say, that while the power of our legislature to require of its citizens to use a stamp, when executing instru-ments of this description, cannot be controverted, there are, among us, banking institutions deriving from the legislature their very existence, and all their powers, which may disregard and disobey the law ; although it requires of them nothing more than it requires of every one of its citizens.

It need not be remarked, that when the judicial department of the government is required to pronounce an act of the legislature to be unconstitutional, it must not be because the judges have doubts, even serious doubts, about the constitutionality of the act; even doubts, which would have constrained them, if they had been members of the legislature, to vote against the bill. "To authorize this court, (said *Judge Patterson*, 4 *Dal.* 161,) to pronounce any law to be void, it must be a clear unequivocal breach of the constitution: not a doubtful and argumentative implication."—"I will never decide any law to be void, but in a clear case," was the language of *Mr. Justice Chase*, 3rd *Dallas*, 386. This is, in truth, more than merely a question, whether an act of the legislature is constitutional. It forces upon us the question, whether past legislation has not taken from those who succeed to its powers and duties, the power for providing for the wants of the State, by just, because equal taxation? It is alleged that this has been done, and that the proof of it is to be found in various acts of the General Assembly in 1821, and 1834, and 1835; and even anterior to all the laws of those sessions, to which reference has been given to us.

In the first place, we are told, that they all possess it, because in granting to them their charters, and the privileges thereby conferred on them, the legislature secured to them the privilege not claimed by them.

Of those who undertake to maintain the affirmative of this proposition, it might be required, carefully to examine the various charters, and to be sure that the power which is claimed for all, has been *expressly* granted to all. For, surely, it will not be pretended, that the mere act of incorporating a company, with an avowal in the act of incorporation, that the company is incorporated for banking purposes and with banking privileges, would confer upon them the right, or rather the exemption, which they now claim. But according to the view which I have taken of this subject, it is not necessary for me to examine all these charters, and to ascertain what privileges given to one, has not been conferred upon others. Let it be assumed, that the legislature in bestowing "*individuality*"

on these associations, have granted to them all, a right to deal in every article, and to employ their funds in every way, in which any citizen may, still the question remains, how do they in virtue of their charters acquire a right, not only to deal in bills of exchange, (this many, if not all of them, possess, as every citizen of the State possesses it,) but to be exempted from all obligation to use stamps, as required by the act of Assembly, when they make a foreign bill of exchange? The law, it is said, imposes "a tax or burthen" upon them, or rather, on one of their privileges. This will admit of doubt: but granting it to be true, it proves nothing in favor of these institutions, unless there can be found in their charters an exemption from the use of the stamps, whenever others are commanded to use them. The question, let it be kept in remembrance, is not whether the State has granted the privilege without limitation, to deal in bills of exchange, but whether the State has surrendered to them a particular portion of the taxing power?

In the case of the *Providence Bank against Billings and Pittman, 4 Peters,* 561, *Chief Justice Marshall* in delivering the opinion of the court, said : "that the taxing power is of vital importance ; that it is essential to the existence of government ; are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relinquish it ; *that a consideration sufficiently valuable to induce a partial release of it,* may not exist ; but as the whole community is interested in retaining it *undiminished,* that community has a right to insist that its abandonment ought not to be presumed, *in a case in which the deliberate purpose of the State to abandon it, does not appear.* \* \* \* \* A company may be incorporated for the purpose of trading in goods as well as in money. If the policy of a State should lead to the imposition of a tax on incorporated companies, could those which might be incorporated, claim an exemption *in virtue of a charter which does not indicate such an intention.* The time may come, when a duty may be imposed on manufactures ; would an incorpo-

rated company be excepted from this duty, *as the mere consequence of its charter?*"

Again, page 563: " The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the government *as a part of itself,* and *need not be reserved* when property of any description, *or the right to use it in any manner is granted to individuals or corporations.* However absolute the right of an individual may be, it is still in the nature of that right, that it must bear a portion of the public burthens, and that portion must be determined by the legislature.''

In the same case, much may be found, which conclusively demonstrates, that incorporated banks, no matter what property they may be authorized to hold ; no matter with what powers they may be cloathed, unless their charters shall *express* the exception, are no more exempted from taxation, than an unincorporated company, and, of course, individuals are, when carrying on the same business. ''A mere private corporation engaged in its own business, would certainly be subject to the taxing power of the State, as any individual would be.''

Much of false conclusion upon subjects of this kind seems to have been produced, by applying the reasoning of the court, in the case of *McCulloh against the State of Maryland,* to private banks, created by the State, and taxed by the State which created them. The rights of these institutions, are not more sacred and inviolable than those of individuals. All that banks, when a charter has been granted to them, can claim, (and to this they have an unquestionable claim,) is, that they shall not be compelled to bear more than their just proportions of the burthens, which the wants of the State ought to impose upon all within its territorial jurisdiction ; that *exemptions* granted to them, in express terms, be regarded, as are similar grants to individuals. For what, after all, is a bank charter? Some seem to regard it, as a grant of nothing but franchises of royal prerogatives. Not so was it understood by the learned judge, from whose opinion I have already borrowed so freely.

*individuality*, on a collective and changing body of men. This capacity is always given to such a body. Any privileges, which may exempt it from the burthens, common to individuals, do not flow necessarily from the charter, *but must be expressed in it, or they do not exist.*" In this case an attempt was made by a bank, to get rid of a tax which was imposed subsequently to the grant of its charter. Of a similar attempt made in *Massachusetts*, we have a report in 12 *Mass. Reports*, 252 ; and in which the *Chief Justice Parker* explains very fully, the rights and privileges of incorporated banks. "The effect of this charter was to give, to the individuals who applied for it and their successors, the right to act as a body corporate and politic, in the management of their common funds, under the restrictions and regulations provided in the charter."

They are as one individual in the management of the capital, in the way and according to the purposes for which they are incorporated. They procure by their charter the privilege, in all contracts and suits, of using one short name, in place of all the names of the stockholders. In *Maryland*, and most of the States, of participating in the profits, without being subject to all the liabilities of a partnership, for banking purposes ; of exempting their own portion of the capital from the payment of debts incurred, while it was invested, by a sale of their stock. One effect of the charter, and of the public confidence which it acquires by reason of its incorporation, is, that they can issue notes, and by means of these, trade with a larger capital than they have invested. These are privileges of considerable value to those who have money to lend, and because of these advantages, prefer an investment in bank stock to the trouble and hazard of lending it themselves. For these privileges, what is called *a bonus*, is often paid, but the payment of a *bonus*, gives them no privileges, or exemptions, which are not expressed in the charter. We are authorized, by a decision of the Supreme Court, ( *The Bank of Columbia against Okely*, 4 *Wheat.*, 234,) to say, that the act of incorporation, may provide for the corporation valuable remedies, which may be taken away. See also 4*th Cranch* 384.

2     v.3

The cases above cited, and indeed, the definitions given above of bank charters, prove, that no matter how extensive their powers, in what articles they are permitted to deal ; if all others dealing in the same articles, are required to use a stamp, the banks also may be required, unless the State has, in express terms, exempted them from the obligation to use them.

If the banks, for any reason which has yet been assigned, could claim this exemption, they might, with equal reason insist, that the "power to sue," given by charter, will exempt them from all obligation to pay the tax upon writs, which all who sue in our courts, are required to pay.

The claim of these banks, to draw foreign bills of exchange, without using a stamp, is not "clear and unequivocal ;" it cannot be made out without, (nor indeed by,) "a doubtful and argumentative implication." Those who maintain it, are obliged to rely on the old argument, (when introduced here, entirely out of place,) "a power to tax, is a power to tax *ad libitum ; that is,* a power to prohibit ; *that is,* a power to destroy ;" and *ex consequenti,* if this law, so far as it relates to banks be constitutional, "the franchise, or banking privilege" granted, may be taken away indirectly ; that is, by imposing upon it taxes, which would render the privilege of no value : "The taxes may absorb the profits." *Chief Justice Marshall's* answer to this is, "then the grant of any other thing implies the same exemption, for that thing may be taxed to an extent, which will render it wholly unproductive to the grantee. Land, for example, has in many, perhaps in all the States, been granted by government, since the adoption of the constitution. This grant is a contract, the object of which is, that the profits issuing from it, may enure to the benefit of the grantee. Yet the power of taxation may be carried so far, as to absorb those profits. Does this impair the obligation of the contract? The idea is rejected by all," 4 *Peters,* 562. Yet the belief is entertained, that it must be maintained in the case of a land, (or other,) tax, before the stamp act of the last session can be proved to be a violation of any contract, to be found in the charters of these banks.

Surely the words "franchise or banking privileges," wherever found, cannot be construed to exempt them from the use of stamps in any of their dealings. The correct meaning of the word "franchise" when used in our bank charters, it is not very easy to ascertain. Some writers are very fond of telling us, that "it is a royal prerogative in the hands of a subject." "In *England* it is some privilege in the hands of a subject, which the king alone can grant; in this country it is supposed to be a privilege or immunity of a public nature, which cannot legally be exercised, without a legislative grant." In 13 *Peters,* 595, *Chief Justice Taney* gives a definition of franchises, of which I entirely approve. "Franchises are special privileges conferred by government upon individuals, and which do not belong to the citizens of the country generally of common right. It is essential to the character of a franchise, that it should be a grant from the sovereign authority; and in this country no franchise can be held, which is not derived from a law of the State." It would be difficult to ascertain, what franchise, according to this definition, the bank has, or how it is to be made out, that its "banking privilege" can authorize a claim by the banks to dispense with stamps, when they, in common with others, are required to use them.

I cannot discover the slightest foundation for this claim in the law of 1821, nor yet in those of 1834 or 1835. I consider the act of the last session, in all its provisions, to be constitutional.

Whether checks or orders require a stamp, must depend upon the *quo animo.* If the payee named in them be the mere agent of the maker, to receive and convey to him the money, there is nothing in the law which would authorize us to say, that it needs to be stamped. It is a mere power of attorney, to be returned if the money be not collected; and gives to the party no right to demand it in his own name. Accordingly a bank needs not require a stamp on orders which it receives for collection. But if a bill, when received by a bank, is one of those which ought to be placed among "bills purchased," then a stamp, in my opinion, is necessary.

The certificate of deposite is, in effect, a promissory note, and not what is called a bank note. It is evidence of a debt, or indebtedness, to the amount expressed in it. It will answer all the purposes of a promissory note, and would probably supersede promissory notes, (in the usual form of them,) if while the latter require a stamp, the former did not.

CHAMBERS, J., stated the conclusions of the court, as follows:

The questions brought before us by the different records, are, in relation to—

1st. A trustee's bond.

2nd. Bonds by executors or administrators.

3rd. A check of a bank in this State, upon a bank in another State ; payable at sight, or otherwise.

4th. A certificate of deposit given by a bank.

We are of opinion, that a stamp is not required for either of these instruments, under the act of 1844, chap. 280.

That "bonds and obligations" are to be confined to such, as are given for the payment of money ; and not for the performance of some official, or other act or duty.

That the banks are secured in the privilege of issuing checks, whether at sight or otherwise ; bills of exchange, whether foreign or domestic ; and certificates of deposit : and that this privilege does not exist, only, in virtue of the act of 1821, chap. 131, sect. 11; and is not, therefore, either confined to the "old banks," as they are termed, nor limited, as to its duration, to the 10th March 1846 ; when, in our opinion, the old charters will expire.

The attorney general, and the adverse counsel, having earnestly requested an expression of the views of the court, upon the various other points filed in these causes, and fully and ably argued, we feel justified, in the peculiar condition of the case, and in the known anxiety of the business portion of the community to be advised on these questions, in expressing the conclusions to which the argument, and a consideration of the authorities, have conducted us.

Burton *et al. vs.* The State.—1845.

We think the law does not require a stamp for any of the following instruments:

A mortgage without a covenant to pay.

A lease, on which is reserved a rent in money or in specifics.

An assignment of property in consideration of an annuity, to be paid by the grantee, for the life of the grantor.

An order or draft not sold, nor intended to be put into circulation, but made solely to obtain possession, by the party, of his own funds.

We think a stamp necessary to the instruments following:

A mortgage with a covenant to pay ; and whether such mortgage be the only security taken, or whether there be, also, a note or bond, also stamped, and for the same debt: the note or bond being, of course, to be stamped.

A due bill, or written acknowledgment of indebtedness to a certain extent.

An account stated, signed by the parties or by the party to be charged, as evidence of debt.

The judgment of the court below is reversed in each case, and judgment entered for appellants, respectively, with costs.

DORSEY and MARTIN, J., dissented from the conclusion, that a mortgage without a covenant to pay the debt, was not subject to a stamp.

CHAMBERS, J., dissented from the conclusion, that a due bill and an account stated hould be stamped.

JUDGMENTS REVERSED, AND

JUDGMENTS FOR APPELLANTS.