FAJARDO SUGAR COMPANY, PLAINTIFF AND RESPONDENT, *v.* RICHARDSON, TREASURER OF PORTO RICO, DEFENDANT AND APPELLANT.

APPEAL from the District Court of San Juan, Section 1, in an Action to Recover Taxes Paid Under Protest.

No. 1165.—Decided April 10, 1915.

TAXES PAID UNDER PROTEST—ASSESSMENT—VARIANCE BETWEEN COMPLAINT AND EVIDENCE.—It having been alleged that there, was a variance between the complaint and the evidence because the complaint refers to the assessment

made by the Treasurer of Porto Rico when, in point of fact, the assessment was finally made by the Board of Review and Equalization, *Held:* that the action of the Board is also necessarily the action of the Treasurer of Porto Rico.

CREDITS—TAXES—EXEMPTION.—Under the amendment made to section 290 of the Political Code in 1904, credits are exempt from taxation in Porto Rico, as previously held in the case of the *Union Central Life Insurance Co.* v. *Gromer, Treasurer of Porto Rico.*

TAXES.—The mere fact that the Legislature indicates an intention to tax all property does not mean that every form or mutation of property is taxable.

ID.—CREDITS.—Credits are not necessarily property under the provision requiring all property to be taxed.

ID.—PERSONAL PROPERTY—CREDITS.—Although personal property generally includes credits, when section 290 of the Political Code, as amended in 1904, specifically excluded them, it must be taken for granted that such was the intention of the Legislature.

ID.—EXEMPTION—EXCEPTION.—It is a settled rule that the Sovereign is bound to express its intention to tax in clear and unambiguous language, and that a liberal construction be given to words of exception confining the operation of duty, though the rule regarding exemptions from general laws imposing taxes may be different.

ID.—CREDITS—PERSONAL PROPERTY—CONSTRUCTION.—Whether the exclusion of credits in section 290 of the Political Code, as amended by the Act of 1904, be considered as an exemption or an exception to taxation, the intention of the Legislature is manifest and is further displayed by the other amendments made in that year to sections 317 and 319 of the same code, in which corporations are required to make return of their personal property, the word ''credits'' being omitted.

ID.—LOANS OR ADVANCES.—The loans or advances made by the plaintiff to sugar manufacturers, railroads and growers of sugar cane, which are not shown to have been secured, nor does the nature of the contracts entered into appear, are either credits or else something which the Legislature has not expressed its intention to include under the classification of property.

The facts are stated in the opinion.

*Messrs. Wolcott H. Pitkin, Jr.,* Attorney General, and *Charles E. Foote, fiscal,* for the appellant.

*Mr. Luis Muñoz Morales* for the respondent.

MR. JUSTICE WOLF delivered the opinion of the court.

This is a suit to recover taxes paid under protest as authorized by Act No. 35 of March 9, 1911. The complainant is a corporation organized under the laws of the State of New York. The defendant, according to the complaint and a supplementary complaint, among other things, assessed property for taxation against the complainant in the sum

of $1,015,530.55.   The complainant objected to the ensuing tax, but nevertheless it paid under protest to said Treasurer the sum of $12,186.37 for the whole year, based on the fore-going assessment.

The complaint and supplementary complaint further set up that the $1,015,530.55 assessed against the complainant consisted entirely of credits, namely, (*a*) advances, loans and current account with the Fajardo Sugar Growers' Asso-ciation in the sum of $743,383.79; (*b*) a current account with the Fajardo Development Company, a railroad company, in the sum of $200,146.76, and (*c*) promissory notes and other evidences of debt in the sum of $72,000.   The complainant maintained that the whole sum aforesaid was exempt by vir-tue of section 290 of the Political Code of Porto Rico and relied principally on the decision of this court in the case of the *Union Central Life Insurance Co.* v. *Gromer,* 19 P. R. R., 856.

From the stipulation of the parties it appears that the Treasurer, for the purposes of taxation fixed by sections 290, 317 and 320 of the Political Code, assessed the prop-erty of the complainant in the sum of $3,357,194.   These sec-tions as amended are as follows:

"Section 290.—That all property not expressly exempted from taxation shall be assessed and taxed.   For the purposes of the assess-ment and collection of taxes, real property shall be deemed to be synonymous with immovables as defined in sections 333, 334 and 335 of the Civil Code: *Provided, however,* That machinery, vessels, in-struments or implements not fixed to the building or soil shall not be deemed to be real property.   Personal property shall include such machinery, vessels, instruments or implements not fixed to the building or soil, live stock, money, whether in the possession of the owner thereof or held by or on deposit with some other person or institution, bonds, stocks, certificates in unincorporated syndi-cates or partnerships, patent-rights, trade-marks, franchises, con-cessions and all other matters and things capable of private owner-ship and not included within the meaning of the term 'real prop-erty,' but shall not include book-credits, promissory notes nor other personal credits.

"Section 317.—The personal property of institutions, corporations and companies incorporated under the laws of Porto Rico other than banking institutions having a share capital shall be assessed to such institutions, corporations and companies by the Treasurer of Porto Rico in the manner provided by this section. The actual present value of the capital of such corporations shall be ascertained by the Treasurer of Porto Rico from the sworn declarations of the presidents, directors or other chief officers of such corporations as required by section 319, and from such other reliable information as the Treasurer may have or secure, and the present actual value shall in no case be less than the value of the capital stock and bonds plus the surplus and undivided earnings of said institutions, corporations and companies, nor less than the market value of the real and personal property of said institutions, corporations and companies, including in personal property rights, franchises and concessions. From the valuation thus obtained shall be deducted the total valuation of real property of said corporations, as ascertained in accordance with the provisions of section 316, and the remainder shall be deemed to represent the personal property of said corporations for purposes of taxation.

"Section 320.—The assessment of every corporation, joint stock and limited liability company not incorporated in Porto Rico but engaged in the transaction of business therein, other than banks and banking institutions having a share capital, shall be made in the manner provided by this Title for the assessment of the property of institutions, corporations, and companies incorporated under the laws of Porto Rico: *Provided, however,* That in the determination of the actual present value of the capital of such corporations only such part of the capital of such corporations shall be considered and assessed as is employed in the transaction of business in Porto Rico, but the amount of such capital shall in no case be less than the value of the real and personal property of such corporation or company situated in Porto Rico, including in such personal property all franchises or concessions granted said corporation or company under the laws of Porto Rico. All obligations imposed upon institutions, corporations and companies incorporated under the laws of Porto Rico, or upon their officers, to fill in and return schedules, under sworn statements or otherwise, shall apply equally to corporations, joint stock and limited liability companies not incorporated in Porto Rico, and their officers. All the shares of stock in banks and banking institutions, whether of issue or not, existing by authority of the United States or of any State of the United

States, or of Porto Rico, or otherwise, and located and doing business within Porto Rico, shall be assessed by the Treasurer of Porto Rico to the owners thereof in the municipal districts where such banks are located, and not elsewhere. In the assessment of all Insular and municipal taxes that have been or may hereafter be duly imposed by law in such municipality, whether such owners are residents of said municipality or not, all such shares shall be assessed at their fair market value on the fifteenth day of January, first deducting therefrom the proportionate part of the value of real estate belonging to the bank and the persons or corporations who appear from the records of the bank to be owners of shares at the close of business on the day next preceding the fifteenth day of January of each year shall be taken and deemed to be the owners thereof for the purposes of this section. Every such bank shall pay to the Treasurer of Porto Rico, at the time in each year when other taxes assessed in the municipality become due, the amount of the tax so assessed in such year upon the shares in such bank. If such tax is not paid, the bank shall be liable for the same, and the said tax, with the penalties provided for in section 330 of this Title, may be recovered by the Treasurer of Porto Rico in the same manner as the payment of other delinquent taxes is enforced. The shares of such bank shall be subject to the tax paid thereon by the bank, or by the officers thereof, and the bank and the officers threof shall have a lien on all the shares in such bank and on all the rights and property of shareholders in the corporate property, for the payment of said taxes. The cashier of every such bank shall make and deliver to the Treasurer of Porto Rico, on or before the fifteenth day of January of each year, a statement, verified by the oath of such cashier, showing the name of each shareholder, with his residence and the number of shares belonging to him at the close of business on the day next preceding the fifteenth day of January as the same then appeared on the books of said bank. All obligations imposed upon institutions, corporations and companies other than banks incorporated under the laws of Porto Rico, or upon their officers, to fill in and return schedules, render sworn statements, or otherwise, shall apply equally to banks as described in this section and their officers.''

In making his original assessment the Treasurer maintains or concedes, as the case may be, that he took into account solely the physical property of the Fajardo Sugar Company, made up of lands, machinery, buildings, improvements, mortgages, leases, bridges, money, and other things, includ-

ing the alleged credits which are the object of this suit. The complainant, not being satisfied with the assessment originally made by the Treasurer, appealed to the Board of Review and Equalization, and the grounds of the appeal were that the valuation made on machinery had been increased by the Treasurer in the sum of $427,627 without taking into account its real value, and that the Treasurer had likewise taxed advances, loans and other credits in the sum of $1,500,785, and also had assessed shares of stock not situated in Porto Rico in the sum of $586,500.

The Board of Review and Equalization fixed the assessment of the Fajardo Sugar Company, in round numbers, in the sum of $3,000,000. Exactly how the said Board arrived at the said sum of $3,000,000 is not at all clear from the record and is so conceded by the Treasurer. The appellant maintains and his principal argument based upon the claim is that the Board of Review and Equalization assessed the property according to the capital stock, making deductions for the property outside of Porto Rico. He maintains that to reach this conclusion the capital stock of the company was taken at the value of $2,569,818, the bonds at $400,000, undivided profits at $587,101, and surplus and insurance fund at $50,000, making a total of $3,606,919, from which the Board deducted the sum of $606,919, as capital employed elsewhere, leaving the total sum to be taxed as $3,000,000.

The company on its appeal asked for a reduction of $427,627 on machinery, and on $1,500,785 of credits. The Board reduced the amount from the estimate made by the Treasurer in the sum of $357,194. The company now is asking that the tax on $1,015,530.55 for each six months be returned. The $1,015,530.55 is a claim for less than the difference between the $1,500,785 originally claimed for credits and the reduction of $357,194 made by the Treasurer.

From one of the exhibits certified by the Treasurer, namely, "Exhibit X to accompany F," it appears that the Board of Review and Equalization attempted to make the

taxation on the basis of the value of the capital stock, etc.; and not upon the actual value of the physical property.

Nevertheless, in another certificate by the Treasurer it merely appears that the Board reduced the valuation made by the Treasurer from $3,357,194 to the lump sum of $3,000,000.

We shall first dispose of a preliminary question of practice raised by the appellant and then consider the powers of the Board and what it must be deemed to have done.

The appellant in his brief maintains that there was a variance between the complaint and the proof. It says the complaint refers to the assessment made by the Treasurer of Porto Rico when in point of fact the assessment was finally made by the Board of Review and Equalization. We think that the action of the Board is necessarily the action of the Treasurer, first, by reason of the Foraker Act, whereunder the Treasurer is the person appointed to collect money in Porto Rico; second, by reason of the adoption by the Treasurer of the reports of the Board of Review and Equalization, and his proceeding to collect by virtue of such assessment; third, by reason of the law governing the action of the Board wherein the Treasurer is ordered to correct the assessment books to conform to the action of the Board which shall deliver all papers and books to the Treasurer, the latter being under a duty to furnish a book to record the decisions of the Board. Sections 309, 310, 311 and 313 of the Political Code. The Treasurer is besides ex officio a member of this Board. There is also an analogy between the action of this reviewing board and the action of a reviewing court. The final action of the reviewing court becomes the judgment of the court below; the final action of the Board of Review and Equalization is also the action of the Treasurer. Furthermore, we think that this question was waived by the Treasurer by reason of the trial court's theory in which this particular question of variance was never raised, by the acceptance of the pleadings and the stipulation and

by the actions generally of the parties in the court below.
It is evident that the parties and the judge below were try-
ing or thought that they were trying the question of whether
these particular alleged credits were unduly taxed.

The original assessment by the Treasurer was on the
physical property of the complainant. It is true, as the ap-
pellant maintains, that in the original return of the com-
plainant it said that its capital stock was $3,000,000, but
in that return the value of the capital stock was in nowise
estimated, nor was any request made by the Treasurer or
any other officer that the value of such capital stock should
be estimated. The Board of Review and Equalization, with-
out apparent data, fixed the value of this stock in the sum
of $2,569,818. How they arrived at such a sum is a mystery
to all the parties in this case. The appellant alleges that the
sum was arrived at without taking into consideration how the
capital of the company was employed in Porto Rico. We are
strongly of the opinion that the Board of Review and Equali-
zation arrived at its idea of the value of the capital stock
by an actual consideration of what the physical property of
the company in Porto Rico was really worth, based partly
on the idea of the capitalization of the company at $3,000,000.
It had no other data before it than the value of such physical
property in Porto Rico, because the assessment made by the
Treasurer, from which the appeal was taken and on which
the board had based its conclusion, contained only the value
of the physical property, and on the basis of the valuation
made by the Treasurer the parties made their argument be-
fore the Board. Furthermore, we agree with the respondent
that even if this is an assessment based on the value of the
capital stock of the property in Porto Rico, as the value of
such stock must necessarily be made up of the value of the
physical property or franchises of the corporation, and as
no due allowance was made by the Board of property which
was claimed to be exempt, if such property is really exempt,
then the company is entitled to have its taxation reduced in

the amount of the credits which the company alleges were improperly included in the original assessment of the Treasurer and which apparently were not considered by the Board of Review and Equalization. We think that there is enough in the record to indicate that the action of the Board was merely a reduction of the sum originally fixed by the Treasurer. The considerations of this paragraph are supported by section 320 of the Political Code, cited above, when it says that only that part of the capital of a foreign corporation shall be assessed as is employed in business in Porto Rico.

The appellant, in spite of the case of the *Union Central Life Insurance Company* v. *Gromer, supra,* insists that the credits are not exempted by the law. He maintains that the Attorney General of Porto Rico, Mr. Brown, and this court in following his opinion were mistaken. The argument is that section 290 merely says that credits should be exempted from their classification under the head of personal property, but that credits are nevertheless taxable because section 290 provides that all property shall be taxed. The appellant points out that by the law of 1902 credits were also taxed and that the only revision that the law of 1904 made was to exclude them from their classification under personal property.

It is a very general and convenient division of property into real and personal. Sometimes credits or choses in action were not considered to be included under personal property, and execution or judicial process against personal property did not run against credits. The mere fact that the Legislature indicates an intention to tax all property does not make every possible form or mutation of property taxable, and some things or claims of value are frequently not considered as property until the Legislature declares them to be so. *Tally, County Treasurer,* v. *Brown,* 125 M. V., 248; *State of Washington ex rel. J. G. Wolf* v. *Parmenter,* 19 L. R. A. (N. S.), 707, citing *People* v. *Hibernia Sav. & L.*

*Soc.*, 51 Cal., 243, where it was held that credits were not necessarily property under constitutional provision requiring all property to be taxed. See also *Gleason* v. *Thaw*, decision of the Supreme Court of the United States, February 23, 1915. Generally, however,—and it has been so held by the courts,—personal property would include credits, and when section 290 specifically excludes such credits we must take it for granted that the Legislature intended what it said. The Legislature, seeing that all physical property is taxed, may have desired to avoid a taxation of claims on that property to avoid duplicate taxation which so frequently falls on the borrower himself instead of on the person holding the credit. The case of the *Union Life Insurance Company* v. *Gromer* has never been overruled and does not depend solely on the opinion of Attorney General Brown, but on a reasoned consideration of the statute. Following this same line of argument, the appellant insists that exemptions should be strictly construed, but the cases in which this principle is announced are more generally clear immunities, *e. g.*, particular individuals, corporations, boards, or charitable organizations, or property exempted to individuals. *Vicksburg, etc., R. R. Co.* v. *Dennis*, 116 U. S., 665; *Providence Bank* v. *Billings*, 4 Pet., 514; 37 Cyc., 908 *et seq.*

Strictly speaking, the exclusion here is an exception or omission to tax, as such difference is pointed out in the case of *Eidman* v. *Martínez*, 184 U. S., 583.

"It is an old familiar rule of the English courts, applicable to all forms of taxation, and particularly special taxes, that the sovereign is bound to express its intention to tax in clear and unambiguous language, and that a liberal construction be given to words of *exception* confining the operation of duty, *Warrington* v. *Furbor*, 8 East, 242, 247; *Williams* v. *Sangar*, 10 East, 66, 69; *Denn* v. *Diamond*, 4 B. & C. 243, 245; *Tomkins* v. *Ashby*, 6 B. & C. 451; *Doe* v. *Snaith*, 8 Bing. 146, 152; *Wroughton* v. *Turtle*, 11 M. & W. 561, 567; *Gurr* v. *Scudds*, 11 Exchq. 190, though the rule regarding *exemptions* from general laws imposing taxes may be different. Cooley on Taxation, 146; *In Matter of Enston*, 113 N. Y. 174, 177."

See also *Hall Company* v. *Commonwealth*, 215 Mass., 326; *Hale* v. *County Commissioners*, 137 Mass., 111; Broom's Legal Maxims, p. 4.

But whether the exclusion of credits in section 290 be considered as an exemption or an exception to taxation, the intention of the Legislature as revealed by that section is not to be mistaken. The intention to exclude is further displayed by the changes made in 1904 in other parts of the Political Code. In sections 317 and 319 of that code, requiring corporations to make returns of their personal property, the word "credits" was included in 1902 and omitted in 1904, the date at which section 290 was amended. And section 290 itself says that for the purposes of taxation real property should include certain things and personal property certain others (excluding credits), thus showing an exhaustive division of property to be taxed.

The appellant, however, makes another and further contention in this case. He maintains that these alleged exemptions were not credits at all but some other form of property. The theory is that these advances or loans to sugar companies, railroads, and cultivators of sugar are all money used in the business of the Fajardo Sugar Company, which is admittedly engaged in the business of the cultivation of sugar. The exact nature of these alleged credits of the Fajardo Sugar Company is not shown by the pleadings or the proof. They are admittedly loans or advances but they are unsecured and the nature of the contracts between the Fajardo Sugar Company and the various debtors is not specifically revealed. If these alleged credits were merely advances made by the corporation, in other words, property or money which had passed out of the custody of the Fajardo Sugar Company, then it might be very well questioned whether such loans or advances are property in the hands of the corporation. What the corporation has, then, is a right to something in the future, whether it be the delivery

of sugar or a right to compensation in default of such delivery.

The intention, then, on the part of the Legislature to tax these advances or loans has not been indicated in any way by the statute. We have seen from the case of *Eidman* v. *Martinez* and the other authorities *supra* that the intention to tax must be clearly indicated by the Legislature. If it would seem unscientific to say that these advances by which individuals owe a duty to deliver goods or money to the corporation are not taxed, then it is evident that the measure of that duty or the damages is a claim properly classified by the company in its return as a credit. Any other construction than that these loans or advances are credits would enable the company thereafter to contend that they were dealing, not with taxable property, but with claims that might arise in the future, and that the proper time to tax these things would be when they became property in the hands of the corporation by reason of the delivery of the things mentioned in the supposed contracts. If it should be deemed to be wise, the Legislature will be given hereafter an easy basis for taxation of these credits. Indeed, section 290 has been in force since 1904 and the fact that the Legislature has not sought to change it to make the taxation of credits specific militates against the theory of the appellant.

We have had some doubt as to whether the complainant ought to recover the whole sum claimed, inasmuch as some other physical property was reduced by the assessment taxes as fixed by the Board of Review and Equalization. However, as the claim for reduction was much larger than the reduction finally made by the Board and as the Board evidently did not regard the claim on the alleged credits and, furthermore, as the issue between the parties was shown by the record to be the return of these credits *vel non,* we think the entire judgment should be

*Affirmed.*

Justices Aldrey and Hutchison concurred.

Mr. Chief Justice Hernández took no part in the decision of this case.

Mr. Justice del Toro dissented.

DISSENTING OPINION OF MR. JUSTICE DEL TORO.

After a careful consideration of all the questions involved in this case, I have concluded that I should dissent from the majority opinion which serves as a basis for the judgment of this court affirming the judgment appealed from and state my reasons therefor in a separate opinion.

Both parties agree on the statement of the facts of the case. The manner of weighing said facts and of applying the law and jurisprudence thereto gave rise to the controversy which the courts are called upon to decide.

Instead of stating the said facts myself I will transcribe them as they appear in the statement of the case which was drafted under an agreement between the interested parties.

"1. That on or about April 12, 1905, the above-mentioned plaintiff, the Fajardo Sugar Company, a corporation organized and existing under the laws of the State of New York, filed in the office of the Secretary of Porto Rico a duly certified copy of its articles of incorporation, including its consent to sue and be sued, and was duly registered in the office of the Secretary of Porto Rico as a foreign corporation authorized to do business in this Island.

"2. That since the said date the plaintiff has ben permitted and authorized from year to year by the Treasurer of Porto Rico to engage in the cultivation of sugar cane and the manufacture of sugar, molasses and rum in Porto Rico, in which business it actually has been engaged, its principal office or place of business being in the town of Fajardo of this Island.

"3. On April 1, 1912, the Fajardo Sugar Company filed a verified corporation schedule for the fiscal year 1912–13 in the Treasury Department of Porto Rico, in which it undertook to give a true and complete statement of all the property belonging to said company in the Island of Porto Rico as of January 15, 1912, and to give full and true answers to all the questions relating to said property. Hereto attached and marked 'Exhibit A,' is a copy of the said corporation schedule with the six accompanying exhibits marked 1, 2, 3, 4, 5 and 9 referred to therein.

"This schedule contains first a report showing the capital of the corporation, as follows: '

| | |
|---|---|
| Capital stock paid up | $3,000,000.00 |
| Bonds, par value | 400,000.00 |
| Surplus and sinking fund | 50,000.00 |
| Undivided profits | 587,101.24 |

"This part of the schedule contains a note stating that the market value of the stock and bonds could not be determined.

"The schedule then went on to state the amount of capital of the corporation employed in business as follows:

| | |
|---|---|
| Total capital invested in Porto Rico | $2,413,360.33 |
| Total capital invested elsewhere | 606,919.10 |
| Total (not footed in the schedule) | $3,020,279.43 |

"The schedule also contained a statement of the property of the corporation in Porto Rico as follows:

| | | |
|---|---|---|
| Real property consisting of lands (Exhibit No. 1) | $24,300.00 | |
| Railroad (Exhibit No. 2) | 61,100.00 | |
| Sugar factory machinery (Exhibit No. 5) | 474,400.00 | |
| Other machinery buildings (Exhibit No. —) | 168,400.00 | |
| Total (not footed in schedule) | | $728,200.00 |
| Mortgages (Exhibit No. 9) | | |
| Cash on hand or on deposit | $25,133.30 | |
| Bills receivable and other credits (Exhibit No. 9) | 1,077,777.30 | |
| Bonds and securities of other companies (Exhibit No. 9) | 2,500.00 | |
| Personal property (Exhibit No. 3) | 80,530.00 | |
| Rolling stock (Exhibit No. 4) | 100.00 | |
| Total value of personal property | | 1,186,040.60 |
| Grand total | (*sic*) | $2,413,360.33 |

"The item of capital outside of Porto Rico is made up of stock of the Fajardo Development Company owned in New York, to the amount of $586,500, and cash to the amount of $20,419 on deposit in New York.

"4. Later the Treasurer of Porto Rico assessed the Fajardo Sugar Company for the purposes of taxation for the fiscal year 1912–13 and on July 13, 1912, sent to said corporation a notice of such assessment, a copy of which, marked 'Exhibit B,' is made a part hereof. The said assessment, as appears from said notice, is as follows:

| | | |
|---|---:|---:|
| Land, 122 acres | $11,800.00 | |
| Sugar factory building and machinery | 982,427.00 | |
| Buildings | 88,000.00 | |
| Other improvements | 12,500.00 | |
| Total value of land and improvements | $1,094,727.00 | |
| Mortgages, leases and stock | 2,093,894.00 | |
| Total value of land and improvements, mortgages, leases and stock | | $3,188,621.00 |
| Railroad, bridges, tunnels, etc. | $62,710.00 | |
| Rolling stock | 200.00 | |
| Total railroad (not footed in schedule) | | 62,910.00 |
| Cash | $25,133.00 | |
| Other personal property | 80,530.00 | |
| Total | | 105,663.00 |
| Grand total | | $3,357,194.00 |

"The item under 'Mortgages, leases and stock, $2,093,894,' was made up as follows:

| | |
|---|---:|
| Mortgages | $499,119.00 |
| Stock in Porto Rico Progress, a corporation organized under the laws of Porto Rico | 2,500.00 |
| Stock in Fajardo Development Company, a corporation organized under the laws of the State of New York | 586,500.00 |
| Bills receivable and other credits: | |
| Advances on crops | 449,506.55 |
| Loans—Fajardo Sugar Growers' Association | 168,723.00 |
| Current accounts | 197,155.00 |
| Current account with the Fajardo Development Company | 200,146.00 |

"5. Later the said Fajardo Sugar Company appealed to the Board of Review and Equalization, a copy of which appeal is attached

hereto and marked 'Exhibit C.'   (Upon receipt of the said appeal by the Treasurer it was filed as 'Appeal No. 821, Case No. 322.') The grounds of the said appeal were as follows:

"1. 'That the valuation of "Machinery and factory buildings" was arbitrarily increased to $427,627 without considering their real value.

"2. 'That the valuation of "Mortgages, leases and stock" includes the following items which, as credits, are expressly exempt by law.   They are:

| | |
|---|---:|
| Advances on crops | $439, 751. 00 |
| Loans to the Fajardo Sugar Growers' Association | 168, 723. 00 |
| Current accounts | 197, 155. 00 |
| Account with the Fajardo Development Company | 200, 146. 00 |
| Stock not owned in Porto Rico amounting to | 586, 500. 00 |

"The said appeal was duly filed with the Board of Review and Equalization together with the tax and assessment schedules, as shown by the Treasurer's certificate attached hereto and marked 'Exhibit D.'

"6. The Fajardo Sugar Company afterwards appeared by its attorney and argued its case before the Board of Review and Equalization, which thereupon reduced the total valuation of the real and personal property assessed against the Fajardo Sugar Company for the fiscal year 1912–13 from $3,357,194 to $3,000,000.   Notice of this decision of the Board of Review and Equalization was duly sent by the Treasurer of Porto Rico to said corporation on August 30, 1912.   A copy of said notice is attached hereto and marked 'Exhibit E.'

"7. In deciding the case the Board of Review and Equalization considered that the total assessment against the Fajardo Sugar Company by the Treasurer for the purposes of taxation for the year 1912–13 was too high and concluded to reduce the amount as formerly stated.   In the argument before the Board it was suggested that the corporation was justly subject to taxation on the total amount of its capital employed in business in Porto Rico, and that the amount of its capital so employed in Porto Rico might be arrived at fairly by computing, at a reasonable value, its capital stock, bonds, surplus and undivided profits (sinking fund) and deducting from the total the sum of $606,919, which is the amount alleged by the company to be employed in business outside of Porto Rico.   For this purpose the capital stock of the corporation was calculated at $2,569,818.

"That the Board finally decided the case by simply reducing the

assessment of $3,357, 194 to $3,000,000, and that it was decided to fix the said assessment on the value of the bonds, surplus and undi-vided profits of the Fajardo Sugar Company, deducting the amount of the capital employed in business outside of Porto Rico. To this end the bonds were taken at a par value of $400,000; the undivided profits at $587,101; the surplus and sinking fund at $50,000, and the capital of the said corporation at $2,569,818, deducting from the total the sum of $606,919, which is the amount claimed by the corporation to be invested outside of Porto Rico, leaving in round numbers the sum of $3,000,000.

"8. On September 2, 1912, said Fajardo Sugar Company paid the sum of $18,000 as taxes on the assessment of $3,000,000, that being the first instalment of the taxes for the fiscal year 1912–13, of which sum the company paid $6,093.19 under protest. On Feb-ruary 28, 1913, the said Fajardo Sugar Company paid an equal sum under a similar protest, this payment being for the second instal-ment of the taxes for the fiscal year 1912–13. Both protests were based on the fact that the assessed property consisted of accounts current, promissory notes and other personal credits exempt by law from taxation, as follows:

" ' (1) Advances, loans and account current with the Fajardo Sugar Growers' Association amounting to $743,838.79.'

" ' (2) Account current with the Fajardo Development Company amounting to $200,146.76.'

" ' (3) Promissory notes and bills receivable amounting to $72,000.'

"Copies of the two protests referred to are attached hereto and marked 'Exhibit G' and 'Exhibit H' respectively.

"9. On January 15, 1912, the Fajardo Sugar Company owned the following property:

" ' (1) Advances, loans and account current with the Fajardo Sugar Growers' Association amounting to $743,838.79.'

"This sum was made up of money for financing crops previ-ously advanced to the Fajardo Sugar Growers' Association, an un-incorporated joint-stock company organized under the laws of the State of New York and engaged in the cultivation of sugar cane in Porto Rico.

" ' (2) Account current with the Fajardo Development Company amounting to $200,146.76.'

"This sum consisted of money previously advanced to the Fa-jardo Development Company, a corporation organized under the laws of the State of Connecticut and engaged in the operation of

a railroad in Porto Rico as a common carrier of freight and passengers, the said railroad running from the municipality of Naguabo to the ward of Mameyes *via* Fajardo. The said advances consisted of unpaid balances on loans made from time to time since the organization of the Fajardo Development Company up to January 15, 1912, for the construction and maintenance of the railroad.

" '(3) Promissory notes and bills receivable amounting to $72,000.'

"These notes represent various amounts owing by residents of Porto Rico and were acquired by the Fajardo Sugar Company in the course of its business. On January 15, 1912, the Fajardo Sugar Company held no security whatever for the credits mentioned in this item."

With the facts before us, let us see whether according to law and jurisprudence the sum of $12,186.37 has been unlawfully collected from the plaintiff for taxes.

A. The first question to be considered is whether "credits" in general are exempt from the payment of taxes in Porto Rico. In the case of the *Union Central Life Ins. Co.* v. *Gromer,* 19 P. R. R., 856, this court held that they were. I took part in the decision of that case and dissented from the majority opinion, but did not state my reasons therefor. I will do so now.

From the year 1900, in which our Revenue Law (commonly known as the Hollander Bill) was enacted, until 1904 there was no question with respect to whether personal and mortgage credits were exempt from taxation. Said credits were assessed and the owners paid the taxes thereon. The difficulty arose on account of certain amendments made to that law in 1904. Said amendments excluded accounts current, promissory notes and other personal credits from the classification of "personal property" contained in section 290 of the Political Code and in other sections closely connected therewith.

I recognize the strength and the logic of the reasonings of Mr. Justice MacLeary in delivering the opinion of the court in the ·case of the *Union Central Life Ins. Co.* v. *Gro-*

*mer, supra.* If it were possible to determine by inference whether credits are exempt from taxation by virtue of the amendments of 1904, I should answer that they are, but in my opinion such a conclusion cannot be reached by inference, an express declaration of such exemption by the Legislature being necessary. Nowhere does the revenue law expressly provide that credits are exempt from the payment of taxes, but in 1900, in 1904 and now the said revenue law contained and does contain the following provision: "That all property not expressly exempted from taxation shall be assessed and taxed." See section 290 of the Political Code. If the Legislature of Porto Rico desired to exempt from taxation credits which it had previously regarded as taxable, it should have exempted them expressly in accordance with the rule laid down and followed by it.

In the case of *Vicksburg & Pacific Railroad Co.* v. *Dennis,* 116 U. S., 665, 668, the Supreme Court of the United States expressed itself as follows:

"In the leading case of Providence Bank v. Billings, 4 Pet. 514, Chief Justice Marshall, speaking of a partial release of the power of taxation by a State in a charter to a corporation, said: 'That the taxing power is of vital importance; that it is essential to the existence of government; are truths which it cannot be necessary to reaffirm.' 'As the whole community is interested in retaining it undiminished; that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the State to abandon it does not appear.' 'We must look for the exemption in the language of the instrument; and if we do not find it there, it would be going very far to insert it by construction.' 4 Pet., 561–563.

"In *Philadelphia & Wilmington Railroad* v. *Maryland,* 10 How. 376, Chief Justice Taney said: 'This court on several occasions has held, that the taxing power of a State is never presumed to be relinquished, unless the intention to relinquish is declared in clear and unambiguous terms.' 10 How., 393.

"In the subsequent decisions, the same rule has been strictly upheld and constantly reaffirmed, in every variety of expression. It has been said that neither the right of taxation, nor any other power

of sovereignty, will be held by this court to have been surrendered, unless such surrender is expressed in terms too plain to be mistaken;' that 'nothing can be taken against the State by presumption or inference; the surrender, when claimed, must be shown by clear, unambiguous language, which will admit of no reasonable construction consistent with the reservation of the power; if a doubt arises as to the intent of the Legislature, that doubt must be solved in favor of the State;' that a State 'cannot by ambiguous language be deprived of this highest attribute of sovereignty;' that any contract of exemption 'is to be rigidly scrutinized, and never permitted to extend, either in scope or duration, beyond what the terms of the concession clearly require;' and that such exemptions are regarded 'as in derogation of the sovereign authority and of common right, and therefore not to be extended beyond the exact and express requirement of the grants, construed *strictissimi juris.*' "

And in the case of *Davenport Nat. Bank* v. *Mittelbuscher*, 15 Fed., 225, 228, the Circuit Court of the Southern District of Iowa said:

"It is now well settled that the shares of stock of corporations generally, in Iowa, are subject to taxation. *Cook* v. *Burlington, supra.* If the stock of savings banks is exempted at all, it must be by the provisions of the section above quoted. As we have seen, it is not clear that such is the effect of that section. It is a sound and well-settled rule for the construction of revenue laws that 'if property, which by a previous general statute is declared liable to taxation, is to be exempted under a later act from bearing its proportion of the public burden, the exemption must rest upon some clear and unequivocal provision of the statute.' "

But even accepting as entirely correct the construction placed upon the revenue law by the majority of this court for the purpose of concluding that since the year 1904 credits are exempt from taxation in Porto Rico, still, in my opinion, the judgment appealed from should be reversed or at least modified.

B. This case is not entirely on all fours with that of the *Union Central Life Ins. Co.* v. *Gromer, supra.* Admitting that we may proceed to classify the items composing the sum of $3,000,000 on which the tax was finally levied and

collected, we find among them, for example, the item of "Advances on crops," which, as shown by the plaintiff itself, amounts to $439,751, and which, according to the rule laid down by the majority of this court, should be regarded as exempt from taxation.

If the theory of inquiring into the intention of the legislature is adopted for the purpose of concluding that by virtue of its amendments of 1904 it exempted credits from taxation, the same rule should be followed in order to determine the nature of the credits exempted.

In order to demonstrate the intention of the legislators, it has been maintained that they did not wish to assess the same property twice; that they did not desire to impose a double tax. So, in assessing a mortgaged property prior to 1904, the amount of the mortgage was deducted. The owner of the property paid taxes on the difference between the real value of the property and the amount of the mortgage and the mortgagee paid on the amount of his credit. By virtue of the amendments to the revenue law, since 1904 when a mortgaged property is assessed for the purpose of levying and collecting taxes the amount of the mortgage is not deducted and the owner is obliged to pay taxes on the total value of the property without any deduction. Hence the truly logical conclusion that in order to avoid what would practically result in a double assessment taxes should not continue to be collected from the mortgagee since the year 1904.

But the matter of advances on crops is entirely different. Both before and after 1904 "The growing crops and products of the land actually owned by and still in the hands of the producer * * * shall be exempted from taxation." Section 291 of the Political Code as amended in 1904. So that, according to the foregoing provision and the construction which the majority of the justices of this court placed upon the revenue law as amended in 1904, the sum of $439,751 lent by the Fajardo Sugar Company to the Fajardo Sugar

Growers' Association as "Advances on crops" neither pays taxes as inverted into the crop of sugar cane of the debtor corporation, nor can it be considered as capital of the creditor corporation. Hence the said sum absolutely escapes the payment of taxes, and I am of the opinion that this could not have been the intention of the Legislature.

C. But this is not all. Although it is true that the assessment made by the Treasurer was based on the figures given in clause 4, it is also a fact that an appeal was taken from that assessment to the Board of Review and Equalization, that the Board heard the appeal and that during the argument "it was suggested that the corporation was justly subject to taxation on the total amount of its capital employed in business in Porto Rico, and that the amount of its capital so employed in Porto Rico might be arrived at fairly by computing, at a reasonable value, the capital stock, bonds, surplus and undivided profits (sinking fund) and deducting from the total the sum of $606,919, which is the amount alleged by the company to be employed in business outside of Porto Rico. For this purpose the capital stock of the corporation was estimated at $2,569,818."

The proceeding followed by the Board was different from that adopted by the Treasurer; nevertheless the Treasurer's plan is that which really has served as a basis for the conclusions reached in discussing and deciding the appeal.

It cannot be denied that by virtue of Act No. 35 of March 9, 1911, providing for the payment of taxes under protest, since that date suit may be brought in the courts for the recovery of taxes wrongfully collected even though said taxes may have been approved by the Board of Review and Equalization, but for that purpose the nature of the tax unlawfully collected must be plainly shown and the exact amount of the same clearly distinguished and determined. And this, in my opinion, has not been done in the present case.

D. Finally, although it should be concluded that all the amounts specified in the complaint, amounting to over a mil-

lion dollars, were exempt from taxation, both justice and equity would require that there should be deducted from this amount the sum of $357,194 which the Board of Review and Equalization deducted in the appeal taken by the plaintiff corporation; for, in view of all the attendant circumstances, I find none to justify the theory that the intention of the Board was to deduct the said sum from the assessment made by the Treasurer upon the "Machinery and factory buildings" of the Fajardo Sugar Company.

Such, briefly, are the grounds upon which I base my dissent.